[No. 8484.]

TALLON, TREASURER OF TELLER COUNTY, ET AL. V. VINDICATOR CONSOLIDATED GOLD MINING COMPANY ET AL.

1. CONSTITUTIONAL LAW—*Particular Statutes.* Sec. 12 c. 137 Laws 1913, is not opposed to sec. 7 of art. X of the constitution. This provision of the fundamental law has not the effect of prohibiting legislation to limit the tax which may be imposed for county purposes. (324, 325.)

Nor is it opposed to sec. 35 of art. V. Requiring that, as a condition precedent to a rate of taxation, by the board of county commissioners, above that specified in the statute, they shall secure the approval of the State Tax Commission, has not the effect to vest in the latter body the power of levying or imposing taxes. (325.)

2. —— *Taxation of Mines.* The legislature may prescribe an arbitrary rule for the taxation of producing mines, basing the assessment thereof upon the output, gross or net, or a prescribed fraction of either or both. (332-335.)

The exceeding difficulty of the subject, and the impossibility of prescribing a rule which will entirely avoid inequality, and occasional hardship, enlarged upon. (331, 332.)

Chapter 139 of the Laws of 1913 is not opposed to sec. 3, of art. X of the constitution. (335, 336.)

This statute, and not that of 1902 (Rev. Stat. sec. 5620) afford the rule for the taxation of producing mines. The provisions of the Constitution, the previous legislation thereunder, and the decisions of the court interpreting the same, examined. (337.)

3. —— *Excessive Assessment—Irregularity—Remedy.* That the assessor, in estimating the value of a producing mine, adopted as the ''gross proceeds'' thereof, the gross value of the ores produced, without the deductions prescribed by the opinion in *Cresson Company v. Paxson*, 56 Colo. 206, *held* a mere irregularity, not invalidating the tax. (338, 339.)

Sec. 5750 of the Revised Statutes affords the tax payer a remedy against such irregularity. (339.)

4. STATE TAX COMMISSION—*Evidence of Its Proceedings*, should unquestionably be preserved by a record thereof; but where this formality is omitted other evidence may be received. (327, 328.)

5. STATUTES—*Construction—Mandatory or Directory.* A statute prescribing the preliminaries incident to the levy of taxes is mandatory or directory, according as the particular provision is or is not for the benefit of the taxpayer—to afford him notice, opportunity for hearing, or other steps for his protection. (328.)

A statute prescribing the time for the levy of the tax, or the delivery of the tax warrant to the treasurer, is not of this character. A failure to observe the statutory requirements, in either of these respects, in point of time, is of no importance to the tax-payer, and does not invalidate the proceeding. The statute is, as to these matters, merely directory (Rev. Stat. secs. 5760, 5666). (328.)

So of the statute prescribing the time for the resolution making the annual appropriation. (Rev. Stat. sec. 1215). (328, 329.)

6. INJUNCTION—*To Restrain the Collection of a Tax.* As a general rule it must be made to appear that the tax is *prima facie* void. (339.)

7. —— *Multiplicity of Suits.* It will not be presumed that the officers having charge of the levy and collection of public taxes will disregard a precedent established by the court of final resort for their guidance. Litigation to be anticipated from such non-observance will not be accepted as ground to enjoin the collection of the taxes levied upon all the producing mines of a county. (339, 340.)

*Error to Teller District Court.* Hon. J. W. SHEAFOR, Judge.

Mr. GUY P. NEVITT, Hon. FRED FARRAR, Attorney General, Mr. NORTON MONTGOMERY, Assistant Attorney General, for plaintiffs in error.

Mr. CLARENCE C. HAMLIN, Messrs. WEST & STRICK-LAND, Mr. N. WALTER DIXON, for defendants in error.

GARRIGUES, J., delivered the opinion of the court.

This is an equitable action for relief by injunction, brought March 5, 1914, by the Vindicator and Granite Gold Mining Companies as plaintiffs, on their own behalf and for others similarly situated, against the County Treasurer and Board of County Commissioners of Teller County, defendants, to restrain the collection of the taxes based upon the assessment and county levy for 1913, against producing mines; to have the assessment declared void; to substitute therefor the legal assessment; to have the 6 mill levy for ordinary county expenses declared void and to substitute therefor the legal levy; to restrain the collection of the taxes other than such as the court shall find and decree valid, and to substitute the lawful for the void tax. Plaintiffs attack the rule followed by the assessor in fixing the valuation of producing mines, his construction of the rule, and the 6 mill rate of levy made by the board for county expenses. It is claimed the object and purpose of the suit is to secure the payment of the county taxes, based upon a legal levy and assessment. The Colorado Tax Commission became a party by intervention. The findings and decree were in favor of plaintiffs, and defendants bring the case here on error. The same principle is applicable to all producing mines a a class, and the levy affects alike all the taxpayers of the county, so that for convenience we will refer only to the mines of the Vindicator Company.

Regarding the assessment, the complaint alleges that this company owns two producing mines, the Hull City and the Vindicator; that in 1913 it delivered to the assessor the sworn statement required by law regarding the output of each mine for the preceding year; that from this and other sources, he ascertained and determined that the gross value of all the ore produced during the preceding year from the

Hull City was $91,386.00, and the net proceeds $20,520.00: that the gross value of all the ore produced from the Vindicator was $752,100.00, and the net proceeds $283,390.00; that in making the assessment of the mines for 1913, he disregarded the provisions of sec. 81c, p. 80, L. 1902, and proceeded under sec. 2, p. 566, L. 1913, valuing all the producing mines of the county at a sum equal to one-half the gross value of the ore each produced, plus all the net proceeds during the preceding year. He fixed the assessed valuation for taxation of the Hull City mine in 1913, at $66,210.00, and of the Vindicator mine at $659,440.00. A tabulated statement taken from the records of the assessor's office shows the producing mines of Teller county are very numerous, and it is alleged they were all assessed in 1913 in this manner. The statement gives the owners, tons of ore produced, gross value of the ore, cost of production, cost of transportation, cost of reduction or sale, net proceeds and assessed valuation of each mine for 1913.

Regarding the levy, it is alleged that the total assessed valuation of all the taxable property in the county for 1913 was $19,677,570.00 and that the maximum levy which the board could lawfully make on such valuation under chap. 137, L. 1913, for county purposes was 2.7 mills on the dollar; that instead of keeping within the limit fixed by law, the board by resolution duly entered December 16, 1913, levied 6 mills on the dollar for county expenses, without being authorized so to do by the Colorado State Tax Commission, or by the electors under the provisions of sec. 12, p. 560, L. 1913, and that the increase beyond the fixed limit is void. It is then alleged that the assessor computed the tax on the void levy against all taxable property, which was extended on the tax roll, and before the 1st of January, 1914, delivered the tax list with his warrant to the County Treasurer for collection; that he computed the taxes on the Hull City to be $2,130.63, and on the Vindicator, $14,705.51, based on the void assessment and levy. It is then alleged that the actual

value for taxation of each producing mine was and is the amount of its net proceeds, as ascertained by the laws of 1902; that the assessable value of the Hull City measured by this rule is $20,520.00, and the tax, computed upon the lawful levy is $573.04, and the assessable value of the Vindicator is $283,390.00, and the tax $5,115.19; that the assessor followed the same rule in assessing all producing mines in Teller county, and that the taxes upon all the mines, as a class, in excess of an amount obtained by computing the net proceeds, ascertained under the act of 1902, by the legal levy, is void; that on September 6, 1913, the Supreme Court of Colorado, in the *Cresson* case, announced a decision construing "gross proceeds" to mean the gross value of the ore, and that the assessor in 1913 followed this decision; that March 2, 1914, upon rehearing, this opinion was withdrawn and a final decision handed down in which "gross proceeds" was held to mean, not the gross assay value of the ore the mine produced, but the amount of money actually received for his ore by the owner. Therefore, it is claimed that if the amendment of 1913 is held to be constitutional, and provides the rule for assessing producing mines, still the 1913 assessment, as to the excess, is void because in violation of the statutory rule for ascertaining the assessable value of producing mines for taxation. It is then alleged that these void taxes are an apparent lien upon producing mines; that the treasurer threatens to enforce the liens by tax sale if the whole tax is not paid, and unless restrained will proceed to advertise and sell the property at public sale, and deliver tax deeds to the purchasers, thereby creating a cloud upon plaintiffs' title, that plaintiffs have no adequate remedy at law; that a multiplicity of suits will follow between the owners of producing mines and the county, and great expense, unnecessary annoyance and litigation will ensue, not only to the plaintiffs and other taxpayers, but to the county, unless the court interferes by virtue of its equitable jurisdiction; that one purpose of the action is to

have annulled the tax, in so far as it is void, and the proper tax substituted, so that the collection of taxes will be relieved from embarrassment, delay and litigation; that March 5, 1914, plaintiffs tendered defendant the lawful tax and interest, which was refused. Plaintiffs ask for permission to prosecute on their own behalf, and for others similarly situated, and pray that the levy in excess of the limit set by the statute be decreed void; that the assessable value for taxation of each producing mine for 1913 be decreed to be the amount of the net proceeds for the preceding year, as provided by the laws of 1902, unless the court finds that sec. 2, chap. 139, L. 1913 is controlling, in which event the excess assessment be declared void on account of the assessor computing the gross assay value of the ore produced, instead of the gross proceeds; that all the taxes for 1913 upon producing mines in excess of an amount arrived at upon computing the legal levy by the lawful assessment be decreed void, and that the court substitute the legal for the void tax and enjoin the collection of the void. After demurrers were overruled, answers were filed admitting that if the taxes are not paid, the treasurer would proceed to enforce the lien by advertising and offering for sale the mines, as well as all other property in the county on which taxes have not been paid, and alleging in substance that the board prior to making the levy on December 16, 1913, submitted to and secured the permission of the Colorado State Tax Commission to make the increased levy; that plaintiffs have a full, complete and adequate remedy at law for any illegality, irregularity, or error in the valuation made by the assessor; that any grievances mentioned in the petition can be remedied by a suit at law; that plaintiffs are seeking a new assessment upon producing mines, which the court is without jurisdiction to make or direct; that the acts of the assessor are final and conclusive upon the court; that plaintiffs' remedy, if any they have, is the action at law provided by sec. 5750, R.

S., 1908, and plaintiffs can maintain no action, because they have not first paid the taxes.

The testimony shows that on November 6, 1913, and before making the increased levy on December 16, 1913, the Board of County Commissioners, being of the opinion that it was necessary to make an increased levy, submitted to and obtained a recommendation from the Tax Commission for such increase. It also shows that sometime in January, 1914, the board was informed that the Tax Commission had kept no record of this recommendation and thereupon the members again went to Denver, and after consultation with the Attorney General's office, filed a petition with the commission, asking a recommendation for the increased levy, which was granted. The board then made a 6 mill levy in the identical language of the resolution of levy passed December 16, 1913.

The court found: 1. That the mines were assessed at an amount equal to one-half of the gross value of the ore produced in 1912, plus all the net proceeds, and that the assessment was void. 2. That the actual assessable value for taxation of the Hull City mine was and is $20,520.00, and of the Vindicator was and is $283,390.00. 3. That the total assessable value of each producing mine in the county for 1913 was and is the amount of its net proceeds for 1912, to be ascertained and computed by the rule provided by the laws of 1902 as interpreted by the Supreme Court. 4. That December 16, 1913, the County Commissioners made a 6 mill levy for ordinary county expenses. 5. That computing the value of producing mines as provided by the laws of 1902, the total valuation of the taxable property of the county for 1913 was $14,592,465.00, instead of $19,677,570.00; that the maximum levy which the board could make upon this valuation was and is 2.7 mills, instead of 6 mills. 6. That the 6 mill levy made December 16, 1913, was without the recommendation of the Tax Commission, and not authorized by a vote of the people as provided by sec. 12, chap. 137, L.

1913, and void. 7. That the recommendation of the Tax Commission obtained February, 1914, was void. 8. That prior to the commencement of the action, plaintiffs tendered to the treasurer amounts greater than the taxes which could be lawfully levied against their respective mines. 9. That as a condition to obtaining relief, plaintiffs must pay or tender to the treasurer all the taxes which could have been lawfully levied by the board December 16, 1913, to-wit: 2.7 mills on the dollar. 10. That when the legal is substituted for the void assessment and levy, the total amount that should be paid to the treasurer for the 1913 taxes on the Hull City mine is $991.15, and upon the Vindicator mine is $6,489.07. The County Treasurer was perpetually enjoined from attempting to enforce the collection of the taxes against plaintiffs' mines, and from selling or attempting to sell any of them for failure to pay the taxes, provided, however, that plaintiffs should have no benefit from the decree unless within 60 days they should pay or tender to the treasurer the amounts above found to be the lawful taxes; that each and every owner of a producing mine should have a like benefit of the decree. The treasurer was perpetually enjoined from enforcing or attempting to enforce the void levy of 6 mills against any taxable property whatsoever, situated in Teller county, and no taxpayer should have the benefit of the decree unless within 60 days he should pay or tender to the treasurer, as taxes for county purposes, an amount equal to a levy of 2.7 mills. The decree then provides the method by which all the taxpayers of the county may avail themselves of its provisions, and the court retained jurisdiction for that purpose.

1. Whether the findings and decree are correct upon the pleadings and evidence, involves the consideration of three important questions: First. Is the assessment of 1913 void because based upon sec. 2, p. 566, chap, 139, L. 1913, which it is alleged is in violation of sec. 3, art. X., of the State Constitution? Second. Should the act of 1913 be

held constitutional and as furnishing the rule to be followed in the valuation of producing mines, did the error or mistake in construing the rule render the assessment void? Third. Is the levy void because in excess of the 2.7 mill levy fixed by sec. 6, chap 137, L. 1913?

2. We will first consider the levy. This question involves the constitutionality of sec. 12, chap. 137, L. 1913, whether it is in violation of sec. 35, art. V., and sec. 7, art. X., of the Constitution. The revenue act of 1913 places a limit upon the levy, graduated according to valuation, which restricts the rate in Teller county to 2.7 mills for ordinary county expenses; but the act also provides a method for increasing the levy, should the board be of the opinion that the amount limited by the act is insufficient, by submitting the question of an increase to the Tax Commission, which may recommend an increase, not to exceed 5 mills, and it is provided further that if the Tax Commission refuses to recommend the increase, such question may be submitted to the voters of the county. Any levy certified to the assessor in excess of such limitations is unlawful. The statute prohibits the assessor from entering upon the tax roll any excess levy, commands him to reduce any excess levy, if made, and to extend upon the tax roll only such parts of the levy as are lawful. The board fixed the rate of levy at 6 mills, which, without the recommendation of the Tax Commission or a vote of the electors of the county, was 3.3 mills in excess of the maximum limit, and it is claimed that all the levy in excess of 2.7 mills is void, could not be extended upon the tax roll, and if extended, cannot be collected. There is no contention that the question of the increased levy was submitted to the voters of the county, so that the only questions presented upon this branch of the case are first, is sec. 12 of the act constitutional, and second, did the board submit to and obtain the recommendation of the Tax Commission for the increase?

3. It is claimed that no increased levy beyond the

maximum limit of 2.7 mills could be made except upon the affirmative vote of the electors of the county. The court sustained this contention, and held that so much of section 12 of the act as undertakes to confer power upon the Tax Commission to recommend an increased levy, is void, because in contravention of sec. 7, art. X. of the constitution, which provides:

"The general assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation." ,

Also in contravention of sec. 35, art. V. of the Constitution, which provides:

"The general assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever."

In this ruling the court committed eror. The right to impose taxes for county expenses is vested exclusively in the counties, by the constitution, which prohibits the legislature from imposing taxes for county purposes, but places no restriction upon the legislature from placing a limit upon the amount of levy, nor does it prohibit the legislature from curtailing the amount of taxes the county may impose for county purposes. Requiring as a condition precedent the recommendation of the Tax Commission before the Board could make an increase did not vest in the Tax Commission the power of levying or imposing taxes. The legislature possessed the power of fixing the maximum levy that a county could make for county purposes, and under the doctrine announced in the *Pitcher* case, 56 Colo. 359, 138 Pac. 509, it could make the Tax Commission the instrumentality of the legislature in determining, as a condition precedent,

whether there existed a necessity for an increase by providing that there could be no increase without the consent of the Tax Commission. The act does not give the Tax Commission power to levy taxes. It provides, when the board finds that the limit of levy fixed by the statute will not raise sufficient revenue for county expenses, a method by which the board may increase the levy beyond the limit fixed by the legislature.

4. The court held that the submission to, and the recommendation of, the Tax Commission were not made during the last quarter of 1913, and that the statute requiring that the levy be made during this quarter, and the tax list delivered to the treasurer not later than January 1st, 1914, was mandatory and not directory.

Sections 5760, 1215, 5666 and 5676, R. S., 1908, provide:

"Sec. 5760. On the first Monday in November, in each year, the board of county commissioners shall by an order to be entered of record among their proceedings, levy the requisite tax for the year, * * * . If, for any cause, the commissioners shall not be able to levy such taxes on or before the first Monday of November, in any year, they may make such levy at any time."

"Sec. 1215. The fiscal year of each county in the state of Colorado, shall commence on the first day of January in each year. The board of county commissioners of each county in this state shall within the last quarter of each fiscal year, and at the same time that the annual levy of taxes is made, pass a resolution to be termed the annual appropriation resolution for the next fiscal year * * * . No further appropriation shall be made at any other time within such fiscal year, * * * ."

"Sec. 5666. As soon as practicable after the taxes are levied, and not later than the first day of January, annually, every county assessor shall deliver to the county treasurer the tax list and warrant under his hand and official seal,

setting forth the assessment roll with the taxes extended   *
*   *   ."

"Sec. 5676.   *   *   *   The failure upon the part of the
treasurer or assessor to comply with any of the provisions
of this and the preceding sections shall in no way invalidate
the assessment, the levy of the tax, or the sale of any prop-
erty, for non-payment of the tax."

The evidence without contradiction shows that Novem-
ber 6, 1913, the board by resolution duly entered, determined
that the amount of tax limited by the act was insufficient for
the needs of the county, and prior to December 16, 1913,
visited the Tax Commission at Denver for the purpose of
securing its recommendation for an increased levy; that the
Tax Commission heard the request of the board, and author-
ized the desired increase, and that on December 16, 1913,
the board, acting under the belief that the recommendation
had been obtained, made a levy of 6 mills.  It also appears
that no record was kept by the Tax Commission of this
meeting, and that the board were not informed of that fact
until some time in January, 1914; thereupon, fearing the
want of such record might make the levy void, the board
again visited Denver, and after consulting with the Attorney
General's office, a petition was prepared and filed with the
Tax Commission, praying its recommendation for such in-
crease, and, upon hearing, the commission by resolution
granted the prayer of the board.  February 28, 1914, the
board again adopted the identical tax levy resolution passed
December 16, 1913, and again certified the rate of levy to
the assessor, who thereupon issued and delivered to the
County Treasurer a new tax list and warrant.  From the
undisputed testimony there is no doubt but the submission
to the Tax Commission, and its recommendation for the in-
creased levy, was made during the last quarter of 1913, and,
while the Tax Commission should unquestionably have made
and preserved a record of its action in this behalf, we know
of no law which invalidates the levy merely because it failed

to do so, nor, where such record was not kept, that prevents the fact from being shown by other evidence. The following authorities are in point: *Mugrage v. People,* 26 Colo. App. 27, 141 Pac. 522; *Georgetown Co. v. Hutchinson,* 4 Colo. 50.

5. Whether statutes involving the constructive steps incident to taxation are mandatory or directory depends upon whether or not the directions given the officers are for the benefit of the taxpayer, to give him notice and an opportunity for a hearing, or for any other purpose important to him. The time for fixing the levy, and delivering the tax warrant to the treasurer, are not for the purpose of giving the taxpayer notice, or a hearing, and are of no concern or importance to him, so far as the time for doing the acts are concerned. Unquestionably it is the duty of the board to make the levy so that the assessor can certify the tax list and warrant to the treasurer on or before the 1st of January, but a failure of the commissioners, or the assessor, to do either within the time specified, in no manner affects the taxpayer and is directory. Cooley on Taxation (2d Ed.) pp. 283, 289; *State v. Hannibal Co.,* 113 Mo. 297, 21 S. W. 14; *Wingate v. Ketner,* 8 Wash. 94, 35 Pac. 591; *Perry and Hale Counties v. Railway Co.,* 65 Ala. 391; *Hallo v. Helmer,* 12 Neb. 93, 10 N. W. 568; *State v. Harris,* 17 Ohio St. 615; *State ex rel. v. Bank,* 120 Mo. 161, 25 S. W. 372.

It is argued that the statute requiring the assessor to deliver his tax list and warrant to the treasurer on or before the 1st of January, makes it mandatory that the commissioners should make the levy before the 1st of January. If it was mandatory that the assessor should deliver the tax list and warrant on or before the 1st of January, there might be force to the contention, but sec. 5676 of the statute expressly provides that the failure of the assessor to certify his tax list and warrant on or before the 1st of January, shall in no manner invalidate the tax list. If the statute requiring the time within which the assessor shall certify his tax list and warrant is directory, then it cannot be ar-

gued that on account of the statute requiring the assessor to certify his tax list and warrant on or before the 1st of January, it is mandatory that the levy shall be made before the first of January. It is our conclusion that the construction to be placed upon the statutes regarding the levy and appropriation, and the delivery of the tax list and warrant, so far as time is concerned, is directory, does not concern the taxpayer, and that the court erred in holding them mandatory.

6. The court held sec. 2, p. 566, L. 1913, was unconstitutional and void, and that sec. 81c., p. 80, L. 1902, was therefore in full force and effect, and provided the rule to be followed in assessing the value of producing mines for taxation, and granted the equitable relief prayed for, by injunction, upon condition that mine owners should pay taxes for 1913 upon their mines, based upon a valuation ascertained by the rule provided in the act of 1902 instead of 1913. It is contended should the act of 1913 be held constitutional, and as furnishing the correct rule for estimating the valuation of producing mines for taxation, then that the assessor of Teller county misapplied the rule as construed in the final decision of the case of *Paxon v. Cresson Co.,* 56 Colo. 206, 139 Pac. 531.

An intelligent understanding and comprehension of these questions require a consideration of the Constitution and statutes, as well as the judicial interpretation thereof, acquiesced in for the past forty years, regarding the assessment of metalliferous mines for taxation.

Sec. 3, art. X. of the constitution adopted in 1876 provided that mines bearing precious metals should be exempt from taxation for the period of ten years from the adoption of the Constitution, and thereafter taxed as provided by law. Pursuant thereto, the legislature, after obtaining the opinion of the Supreme Court, in 1887 passed an act providing for the taxation of mines, by which it divided them, for this purpose, into two classes: producing and non-produc-

ing, and all mines producing mineral exceeding in value the sum of $1,000.00 per annum, were arbitrarily classed as producing mines. Sec. 3, p. 341, L. 1887; *People ex rel. v. Henderson*, 12 Colo. 372, 21 Pac. 144; *Pilgrim Co. v. Teller County*, 32 Colo. 338, 76 Pac. 364.

The act then provided that all producing mines should be valued for revenue purposes at a sum not to exceed one-fifth of the gross proceeds from the mine during the preceding year. This act was declared constitutional, was followed and remained the law until 1902, when it was amended by an act providing that all mines whose gross production exceeded $5,000.00 per annum, should be classed as producing mines, and all others as non-producing, and that all producing mines should, for taxation, be valued at a sum equal to one-fourth the gross proceeds for the preceding year, unless the net proceeds exceeded one-fourth the gross, in which event the mine should be valued at an amount equal to the net proceeds for the preceeding year. Three arbitrary changes were made: First. A producing mine was raised from $1,000.00 to $5,000.00. Second. The fraction was raised from one-fifth to one-fourth, and Third. If the net exceeded one-fourth the gross, then the mine was to be assessed at a sum equal to the net, instead of a fraction of the gross. This mode of estimating the value of mines for taxation, by an arbitrary rule fixed by the legislature in 1887 and 1902, has been upheld in the following cases, as constitutional. *Taxation of Mining Claims*, 9 Colo. 635, 21 Pac. 476; *People ex rel. v. Henderson*, 12 Colo. 369, 21 Pac. 144; *Ames v. People*, 26 Colo. 107, 108, 109, 56 Pac. 656; *Pilgrim Co. v. Teller County*, 32 Colo. 334, 76 Pac. 364; *Foster v. Hart Co.*, 52 Colo. 459, 122 Pac. 48; *Paxon v. Cresson Co.*, 56 Colo. 206, 139 Pac. 531.

In 1913 the legislature again amended the law by providing that the assessor shall for the purpose of assessment for taxation, value each producing mine at a sum equal to one-half of the gross, plus all the net proceeds for the pre-

ceding year. Sec. 2, p. 566, L. 1913. And this is the act, the constitutionality of which is challenged.

7. No question was raised here, nor was before the court, involving the actual full cash market value of the mines. Both sides agree the controversy is over which act is controlling. The assessor attempted to follow the arbitrary rule of valuation prescribed by the act of 1913, and the question is whether he should have followed it, or the act of 1902, and, should the former act be the law, then whether he rightfully construed the act and made a proper application of the rule. It is claimed the act of 1913 is in violation of sec. 3, art. X., of the Constitution, which provides:

"All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal." and is void: First. Because it singles out producing mines and causes them as a class to be assessed and taxed at an amount which more than equals their net proceeds; that while other property in the county is assessed at its actual cash value, producing mines are assessed at much more. Second. Because it establishes a rule calculated to and which does produce gross inequality and injustice in the burden of taxation between the owners of producing mines.

Metalliferous mines constitute a class of property of such character that their values are unknown, uncertain, fluctuating, hard to estimate, and difficult to ascertain. Ordinarily it would be impossible for the assessor to know the extent or value of ore shoots, or of a mine. The value ultimately, of course, depends upon the net proceeds derived from the ore, but this cannot be known until the ore has been extracted, after which the mine, as such, has no value. The assessment, from the nature and character of the prop-

erty, furnishes an intricate, perplexing and difficult problem in taxation, of many and peculiar complications. Unless some legislative rule of uniformity is established, by which the value of mines may be approximated for taxation, great lack of uniformity will result, occasioned by assessors of the various mining counties following different rules, or adopting different methods in arriving at valuations. It is therefore held, for the purpose of securing uniformity throughout the state in the assessment for taxation of this class of property, that the legislature may adopt any rule it sees fit that is not palpably unjust, oppressive or inadequate. Indeed, both sides to the litigation concede that the rule established in 1887 and 1902 is constitutional, and plaintiffs seek to have their property assessed under the rule of 1902, while defendant claims the act of 1913 is constitutional and is the law that should be followed.

In 1887 this court announced an opinion in answer to legislative inquiry, in which it said:

"If the legislature should see fit to make the gross output of producing mines the criterion to govern assessors in determining the valuations of this class of mining property, we perceive no constitutional objection to the method."

*Taxation of Mining Claims,* 9 Colo. 639, 21 Pac. 476. Acting in accordance with this opinion, the legislature adopted the rule that producing mines should be assessed at a sum equal to one-fifth of the gross proceeds. This was an arbitrary rule, adopted as a method of estimating or approximating the value of producing mines, regardless of the net proceeds. Instead of taking all the gross proceeds, as suggested, it chose a fraction as representing the sum which would constitute the value for taxation. No mention is made of net proceeds. They may be more or less than one-fifth the gross proceeds, or amount to nothing. It made no difference. For the purpose of taxation, the assessor can exercise no judgment or discretion as to values. He must follow the rule and fix a value on the mine at a sum equal

to one-fifth the gross proceeds. It is contended the legislature presumed that four-fifths of the gross value was consumed in production, and the remaining one-fifth was the net. If this be true, it only shows that the legislature, in the exercise of plenary power, may arbitrarily establish a rule. The act of 1902 changed the fraction from one-fifth to one-fourth the gross, unless the net exceeds one-fourth the gross, in which event the value of the mine should be assessed at a sum equal to the net. By the act of 1902 the assessable value might be a sum equaling one-fourth the gross, or all the net, while by the act of 1887 it could only be one-fifth the gross. If there was no net, or if it was equal to or less than one-fourth the gross, then one-fourth the gross was used, but whenever the net reached a sum more than one-fourth the gross, the net was used. So by the act of 1902 we had an arbitrary rule by which in one contingency one-fourth the gross, and in another all the net, was used to obtain the sum that should equal the value of the mine for taxation. The question of the constitutionality of the act of 1887 was in litigation, and Chief Justice Helm, speaking for this court in the *Henderson* case, said:

"In approaching the consideration of this case we remember that the act challenged is framed in the interest of the public revenue; that to a limited extent it is an exercise of the taxing power, and that, therefore, only upon the most clear and convincing grounds should the court consider favorably objections thereto. We also bear in mind the familiar principles that, except as controlled by constitutional limitation, the authority of a state legislature in enacting laws is plenary, and that, unless there be a clear and positive repugnancy between a statute and the constitution, the statute must be upheld."

\* \* \*

"In some instances one-fifth of the gross output will represent more, and in other instances less, than the real net profit. But this is not intended to be a tax upon the net

profit. It is a tax upon the supposed value of the property itself; the proportion of the gross output selected being simply a basis or guide provided by the legislature in approximating such value. These suggestions only serve to illustrate the propriety of classifying producing mines by themselves, and applying thereto special rules for ascertaining values."

*People ex rel. v. Henderson,* 12 Colo. 371, 377, 21 Pac. 144. In the *Hart* case, 52 Colo. 469, speaking of the gross and net proceeds mentioned in the act of 1902, it is said:

"A fixed proportion thereof, or the actual net proceeds if they exceeded such proportion, would fix the value of such property for the purposes of taxation."
and again on the same page:

"The valuation for the purpose of taxation of a producing property is based upon a percentage of such production, or the net proceeds if they exceed the percentage specified." In 1913, the law was again amended, but this time the legislature instead of using some fraction of the gross, or all the net, used a fraction of the gross and all the net, as the criterion. If, as contended by counsel, a fraction of the gross was intended to represent the net, and the legislature meant by the acts of 1887 and 1902 that mines should be valued at a sum equal to the net proceeds, then by the act of 1913, it must have intended to change the rule, and adopt all the net, and a fraction of the gross, as the criterion in measuring the value for taxation. But we do not agree with counsel that only the net has been or can be adopted as the basis of the rule. The act of 1887 was based upon a fraction of the gross production; the act of 1902 was based upon a fraction of the gross production, or upon the net proceeds when they exceeded this fraction; the act of 1913 is based upon a fraction of the gross production, and the net proceeds. The effect is to change the word "or" in the act of 1902 to "and" in the act of 1913. If it was constitutional in 1887 for the legislature to choose one-fifth of the gross,

and in 1902 one-fourth of the gross, unless the net exceeded one-fourth the gross, in which event all the net should be used, it was constitutional in 1913 for it to adopt one-half the gross and all the net as the criterion. One-fifth or one-fourth the gross is not the same thing as the net, and it is only by an arbitrary rule that counsel can claim that they represent the net. That the legislature did not intend that these fractions should arbitrarily represent the net, is shown by the act of 1902 where it is provided that the net shall be used only if it exceeds one-fourth the gross. It is claimed a fractional part of the gross is used arbitrarily to represent the net whether it in fact does so or not; but this cannot be true because the act provides the gross shall be obtained by deducting the cost of transportation and treatment and the net shall be ascertained, not by an arbitrary fraction of the gross, but by deducting from the gross the cost of reduction, and then that a fraction of the gross, plus all the net obtained in this way, shall be a sum equaling the value of the mine for taxation. While the legislature could not say that one-half the gross, plus all the net, in fact equals the net proceeds, it could lawfully say that the amount so determined should represent the value of the mine for taxation. The statute provides a rule for arriving at the value of producing mines for taxation and is constitutional.

8. It is contended the 1913 act is unconstitutional because instead of producing equality and uniformity in the burden of taxation, it results in gross inequality and injustice between the owners of producing mines as a class. It is said since the gross proceeds equal the net, plus the cost of extraction or the production of ore, that the cost of production is necessarily included in the gross proceeds, so that the ultimate value of the gross proceeds to the owner of the mine depends on how much of the gross proceeds are consumed in production; that the real value of the gross proceeds to one owner may represent a great deal, while to another, very little or nothing, depending on how much of

the gross is swallowed up in the cost of production; therefore the owners of high grade mines will be favored in the cost of production and taxation, as against the more unfortunate owners of low grade properties. It is neither the net nor gross proceeds that are taxed. It is the mine. They are only employed in formulating a rule by which the value of the mine may be estimated or approximated for the purpose of taxation. Then, it is not always true that the cost of production in low grade mines is comparatively the highest. It may be and often happens that the owners of low grade mines are the more fortunate. As the gross includes the net, plus the cost of production, when the cost of production increases, the net decreases and *vice versa.* Mining operations are attended with so many intricate difficulties, uncertainties, and complications, that we have upheld the power of the legislature to provide a uniform rule for their taxation. The same objection here urged was raised to the acts of 1887 and 1902, and we cannot see that the act of 1913 in any manner changes the principle involved. It may produce some inequality and hardship in particular cases, as the other acts undoubtedly did, but the ingenuity of man cannot devise a system for the taxation of mines in which this will not be the case. From the very character of the property there can be no system evolved that in some instances will not produce inequality and lack of uniformity in taxation. So long as our present system of assessment prevails, such inequality must be treated as an unavoidable incident. In the *Henderson* case, Chief Justice Helm speaking for the court relative to the act of 1887, said:

"Exact uniformity and mathematical accuracy in valuations are absolutely impossible. Nothing that can be devised by human reason will secure such exactness or accuracy."

In *Ames v. People,* 26 Colo. 105, 56 Pac. 656, Chief Justice Campbell speaking for the court, said:

"In the method of laying a tax, either as to the assess-

ment or the apportionment, the general assembly is not restricted by the constitution, and unless the legislation is palpably unjust, oppressive, or inadequate, courts will not substitute their judgment for that of the legislature."

In the *Hart* case, 52 Colo. 468-471, 122 Pac, 51, 52, Mr. Justice Gabbert speaking for the court, said:

"The constitution leaves the subject of assessing mines to the wisdom of the legislature by simply requiring that it shall prescribe regulations by general law which shall secure just valuations for the purposes of taxation. If the rules so prescribed are not clearly calculated to produce gross inequality and injustice in the assessment of different parcels of property belonging to the same class, the courts will not interfere. No doubt instances of injustice and hardship will sometimes result under the statute now under consideration, but this is necessarily true of all statutes providing methods for the assessment and taxation of property. Exact uniformity and mathematical accuracy in values for these purposes are absolutely impossible. No statute can be framed which will bring about these results."

\*    \*    \*

"So long as classification is based upon the nature of property justifying it, there is nothing to forbid legislative classification for the purpose of taxation or to prevent the fixing of valuation of different classes by different methods, provided that by the method prescribed for a particular class of property, the burden of taxation is uniformly imposed upon that class, is just and equitable, and does not exempt it from bearing its fair proportion of the burden of taxation, as compared with other classes of property."

9. We are of the opinion the levy fixed by the board of county commissioners is legal and valid, that the act of 1913 is constitutional, and that it, and not the act of 1902, provides the true rule for estimating the value of producing mines for taxation; that the findings and decree upon the pleadings and evidence to the contrary are erroneous. But

it is contended, granting the levy is legal, and the act of 1913 valid, still that the assessment was void, at least as to the excess, because the assessor did not follow a proper construction of the statute; therefore plaintiffs are entitled to equitable relief by injunction.

September 6, 1913, we handed down an opinion in what is known as the *Cresson* case, overruling the lower court, in which we construed "gross proceeds" to mean the gross value of the ore extracted, without deducting the expenses of the cost of transportation to the place of sale or reduction, and the cost of sale, treatment or reduction. Following this opinion as the correct interpretation of the law, the assessor construed "gross proceeds" to mean the gross value of the ore extracted from the mine without any deductions. March 2, 1914, this opinion was withdrawn, and a final opinion upon petition for rehearing was announced, affirming the judgment of the lower court, in which we held that the words "gross proceeds" did not mean the gross assay value of the ore extracted from the mine without deductions, but meant the amount of money actually received by the owner for his ore, after deducting the cost of transportation to the place of sale or reduction, and the cost of sale, treatment, or reduction. So it is evident under the final decision of the court, the assessor erred in his judgment in the proper construction of the rule. But this does not make the tax void, as where no tax is authorized by law, or where the property is not subject to taxation, or a rate of levy is made prohibited by law, or the assessor adopts a rule for approximating values where no rule is provided by statute. In this case there was a valid tax. A tax was authorized, and it cannot be said a tax was imposed where no tax was authorized. The rate of levy was valid, the property was in existence, and was subject to taxation. The legislature provided a rule for estimating and arriving at its value for taxation. The assessor had the constitutional power to assess it and followed the correct rule, he therefore

was acting within his jurisdiction. That he erred in judgment in a proper construction of the rule is undoubtedly true, but this was not such a lack of jurisdiction as would render the tax void. It was an error in assessment. The difference consists in an absence of authority, and a mistake in its exercise. It comes under the general head of irregularity, defects, omissions, mistakes or errors of judgment, and does not render the tax *prima facie* void. When the tax is erroneous or illegal for the reason that the assessment is erroneous, sec. 5750 R. S. 1908 furnishes an adequate legal remedy by first paying the tax, and then bringing a suit to recover back the excess. It is said this would cause a multiplicity of suits at law which would mulct the county in unnecessary costs, sufficient to give a court of equity jurisdiction. It is a prerequisite before a court of equity will interfere to restrain the collection of taxes, as a general rule, though there may be some exceptions, that the tax must be *prima facie* void. . *Oregon Bank v. Jordan,* 16 Ore. 113, 17 Pac. 621; *Balfour v. City of Portland,* (C. C.) 28 Fed. 740; *McLeod et al. v. Receveur,* 71 Fed. 455, 18 C. C. A. 188; *Mayor v. Davenport,* 92 N. Y. 604; *Collins v. City,* 118 Ia. 30, 91 N. W. 791.

In the next place we do not think it is shown there will be a multiplicity of suits. If the county permits such a thing to happen after this pronouncement, it must suffer the consequence. The county confesses the error of the assessor which it expresses a willingness here to correct, and only collect the proper tax. Plaintiffs in their briefs say they are willing and anxious to pay the proper tax when the court announces the correct rule by which it can be ascertained. With this existing unanimity of good will and desire to abide by the rule set by this decision, it should not be necessary to bring any suit at law.

We hold the act of 1913 constitutional and the levy valid. The *Cresson* case, 56 Colo. 206, announces the proper interpretation of the rule. We will not presume after a

precedent has been established by this court for the guidance of the taxing officials of the state, that they will not follow it. We believe the error of the assessor can and will be corrected by the proper taxing officers, and that the owners of producing mines will have no trouble with the officials in paying into the county treasury their just taxes based upon a proper assessment ascertained in harmony with the rule of construction here announced. If any question should arise, there is no doubt but what each producing mine can pay the tax demanded and then bring suit to recover back any excess with costs. This would prove such an expensive luxury, and cause the county such an expense in the way of costs, that we cannot presume it will happen.

The judgment is reversed and the cause remanded with directions to the lower court to dismiss the action.

*Reversed.*

Decision *en banc.*

On petition for rehearing HILL, J., WHITE, J., and TELLER, J., dissent.

TELLER, J., dissents:

I can not agree with the conclusion of this court that the judgment of the District Court was wrong; nor am I willing that some of the statements in the court's opinion, as to the effect of our former adjudications which are used as premises for the conclusion, go unchallenged. In the court's opinion, in discussing the 6 mill levy, it is said that "under the doctrine announced in the *Pitcher* case, 56 Colo. 359, 138 Pac. 509, it [the legislature],—"could make the Tax Commission the instrumentality of the legislature in determining, as a condition precedent, whether there existed a necessity for an increase, by providing that there could be no increase without the consent of the Tax Commission." The case cited is thus made the basis of holding, without discussion, that section 12 of chapter 137, Laws of 1913, is valid.

Accepting the law laid down in that case solely because it has been so announced by this court, I am unwilling that its application should be extended beyond the facts there presented for determination. A careful reading of the majority opinion in that case, and of the three dissenting opinions, shows that section 12 of the law of 1913 was not considered or even mentioned. That case involved only the matter of assessments.

The question being still open for determination it should be decided upon due consideration as a grave constitutional question. According to the genius of our institutions local affairs are to be managed by local officers, and to empower a state commission, not recognized by the Constitution, to determine so important a question as that of the amount of taxes that a county may levy, is contrary to the whole theory of democratic government.

It is not sufficient to say that "the act does not give the Tax Commission power to levy taxes." True, it does not do so in express terms, but the effect is, beyond question, to give it that power. If that be not so, why the discussion as to effect of the commission's order in this case? If the excess of the levy beyond 2.7 mills is valid only by reason of the act of the commission, then that act in legal effect, constituted the levy. The most that can possibly be said for it is that the Tax Commission and the County Commissioners, acting jointly, made the levy. Sec. 35 of art. V. of the Constitution clearly prohibits interference by special commissions or other bodies therein named with local affairs, including the levying of taxes. It is true that the legislature may fix a limit of levy, but it can not delegate that power to any board or commission. In my opinion, section 12 of the law under consideration, is void as an attempt to delegate legislative power to the Tax Commission, and the excess levy above 2.7 mills is also void. I am further unable to accept the conclusion that the levy is merely irregular because the assessment was made under a wrong construc-

tion of a fixed rule. I am at a loss to understand how it can be said that the assessor followed the correct rule, since it is admitted that he did not make a correct valuation under the law as construed by this court.

The law provides for the furnishing to the assessor of specified data, and the valuation of producing mines for assessment purposes, is then a mere matter of mathematical calculation. The rule consists in the prescribed method of making these computations. When that method is not used, the rule is not used. So, when the assessor in this case applied to the data in hand a method of computation not recognized by the law he did not use the rule prescribed by law. Once he had departed from the lawful method he might as well have applied one system of computation as another. In short, he was making his own rule, and not merely putting a wrong construction on some minor feature of the assessment procedure. An assessment thus made is no assessment, and a tax levy under it is void.

The judgment of the District Court was therefore correct, and should be affirmed.