No. 17,004.

CITIZENS' COMMITTEE FOR FAIR PROPERTY TAXATION, ET AL. *v.* WARNER ET AL.
(254 P. [2d] 1005)

Decided February 18, 1953.

122

Mr. JOHN A. McCARTHY, Mr. JACK JENKINS, Mr. WILLIAM L. LLOYD, for complainants.

Mr. L. E. LANGDON, for respondent officers of Pueblo county.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. FRANK A. WACHOB, Assistant, Mr. C. M. SOLLER, Assistant, for respondents Colorado Tax Commission and State Board of Equalization.

*En Banc.*

MR. JUSTICE CLARK delivered the opinion of the court.

THIS is an original proceeding in the nature of prohibition, in which a rule to show cause was duly issued. No hearing having been had before any trial court, the issues before us are confined to those matters presented by the pleadings of the respective parties, including the documents thereto attached as parts thereof. The sub-

ject involved is the validity of the 1952 tax assessment in and for the County of Pueblo.

In the opening paragraph of the "Statement of the Case and Brief in Support of Complaint" is what we take to be, from a study of the complaint, a general, over-all statement of complainants' position and basis of attack in language as follows: "Complainants deny the validity of the 1952 *reappraisal* of Pueblo County property allegedly performed by the County Assessor as ordered by the Colorado Tax Commission, on the grounds that said *reappraisal* was illegal, unconstitutional, and void; that the Respondents failed to provide to Complainants their statutory rights to notice and opportunity for hearing, that said *reappraisal* in its present stage is inequitable and confiscatory, that complainants will suffer irreparable damage if said *reappraisal* is not set aside, that said *reappraisal* has never been completed, that the constitutional requirement of uniformity of taxation has not been complied with, and that complainants will be deprived of their property without due process of law unless the relief prayed for herein is granted. * * * " (For reasons which hereinafter will more fully appear, we have supplied emphasis to the term "reappraisal" which appears five times in the quoted portion of counsel's statement.) Reference to the complaint supplies details of the matters generally contained in the foregoing statement, among which are:

A. Violation of statutes concerning notice and fixing time: (1) That the county assessor failed to give proper legal notice of the date upon which he would hear objections to the assessment roll. (2) That the county clerk failed to give proper notice of the date of meeting of the county Board of Equalization.

B. It is alleged that on July 1, 1952, the reappraisal of property in Pueblo county had not been, is not yet, and probably for another year, will not be completed. Because the reappraisal was incomplete on July 1, 1952, it is asserted that no assessment roll had been completed

and none such was or is yet in existence, thus making it impossible: (1) For the assessor to hear objections thereto as provided by chapter 142, section 114, '35 C.S.A., resulting in his failure to do so, and likewise in, (2) his inability to submit to the County Board of Equalization a complete assessment of all property in the county by the date of its first meeting as required by section 133, chapter 142, '35 C.S.A.; (3) that, because of not having before it a completed assessment roll, the meetings of the County Board of Equalization were illegal and invalid up to the time and date when, by statute, said meetings should have been concluded.

C. Notwithstanding that on September 13, 1952, the assessor mailed to the Colorado Tax Commission an abstract of a completed assessment of all property subject to taxation in Pueblo county, it is alleged that subsequent actions of the Colorado Tax Commission and of the State Board of Equalization with respect thereto are illegal and void, (1) Because not within the time prescribed by law; and, (2) the assessment was invalid because the reappraisal was, and yet is, incomplete.

D. That, because of all of the foregoing matters, complainants allege they have been deprived of their rights to object, appeal, and otherwise oppose the assessments of their property; that such have been arbitrarily levied, and that same are discriminatory and excessive, particularly with respect to residential properties, which come under the classification of "Real Estate Improvements;" this being the type of property in which complainants are interested.

Complainants further plead that, unless granted the relief prayed by them by this court, they "will suffer irreparable damage and injury" in real and substantial portions; also asserting that they were prevented from pursuing the usual administrative procedures concerning the presentation of objections to their tax assessments by reason of the failure of respondents to complete the reappraisal and extend the tax rolls based

thereon, thus forcing complainants to resort to this original proceeding.

I.

While from the complaint itself it appears clear that complainants' various contentions, in their entirety, are predicated upon the failure of the authorities to complete the tax reappraisal program in Pueblo county in time for the 1952 assessment, this position is emphasized and definitely made manifest by argument contained in both the opening and reply briefs filed on their behalf.

The "reappraisal" referred to is that "of the assessed valuation of the taxable property subject to the ad valorem tax" under the supervision of the Colorado Tax Commission, begun in the forepart of 1949, practically state-wide in extent, with approval of the legislature. Chapter 111, S.L. 1947 and chapter 95, S.L. 1949. No limitation of time within which the reappraisal should be completed was imposed. It has been completed in many counties of Colorado but not in all. The County of Pueblo is one of those in which, it is admitted, the reappraisal is incomplete. No statute of Colorado requires the completion of the reappraisal prior to assessment of property for ad valorem taxes for 1952. Quite the contrary, the statute does require that "all taxable property shall be listed and valued each year, and shall be assessed at its full cash value; land to be listed and valued separate and apart from the personal property and improvements thereon." Section 2, chapter 142, '35 C.S.A.

While the property owner is required, under section 48 of chapter 142, as amended by section 2, chapter 252, S.L. '51, page 713, to furnish to the assessor his statement under oath "setting forth specifically all the real and personal property owned by such person" on March 1st of each year, and, by section 50 of chapter 142, as amended by section 5, chapter 158, S.L. '43, page 492, to set forth therein a description of his real estate "sufficient to identify the same," the duty of determining the final estimate of value of such property for the

purpose of taxation devolves upon the assessors. *Fairlamb v. Bowle,* 101 Colo. 135, 137, 138, 71 P. (2d) 417.

■ It not only is the duty of the assessor to see to it that all property within his county is returned for tax assessment, and to finally fix the valuation upon each item for that purpose, but he further is obligated to undertake, so far as within his power and judgment, to see to it that taxes shall be uniformly assessed within his county. "All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal;" Section 3, Article X, Colorado Constitution.

■ Early judicial attention was given to defining this section of the Constitution in various matters before this court, in none of which, however, was it more clearly stated than in *Ames, County Assessor v. People ex rel.,* 26 Colo. 83, 107, 56 Pac. 656, wherein it is said: "The uniformity and equality enjoined by the Constitution require only that the same means and methods be applied impartially to all the constituents of each class, so that it operates equally and uniformly upon all persons and corporations in similar circumstances."

■ Nor is the assessor a free agent in the performance of the exacting official duties imposed upon him by law, but he is under the supervision of the Colorado Tax Commission, the express province of which is to see to it that the assessment of all property throughout the state "be made relatively just and uniform and at its true and full cash value"; and "to require all county assessors, * * * under penalty of forfeiture and removal from office * * *, to assess all property of every kind or character at its actual and full cash value." Section 157, chapter 142, '35 C.S.A.; *People ex rel. v. Pitcher,* 61 Colo. 149, 156 Pac. 812.

When it came time for respondent Warner, as county

assessor of Pueblo county, to make up his tax roll for the year 1952 in his county, the revised valuations under the reappraisal program throughout the state were going into effect and operation. His work of reappraisal was not fully completed, although it would appear that it was sufficiently far advanced that trends of changes from former standards were proportionately discernible where reappraisal had not actually been made. His affidavit (Respondents' Exhibit 1), appears before us, wherein he avers that on July 3, 1952, he caused notice to be published that he would, commencing on July 7, 1952, sit at his office "for the purpose of hearing any and all objections to the assessment roll for the year 1952," and that at all times mentioned in said notice he had before him the assessment roll of the property sub-. ject to assessment and taxation within the county of Pueblo; "That the valuations on said assessment roll were determined as follows, to wit:

"(a) On personal property, the actual valuation was placed thereon by appraisal as of March first (1st), 1952;

"(b) On lands within the business districts of Pueblo, exclusive of improvements, the reappraisal value was used where such lands had been reappraised; where not reappraised because of time limitation, a uniform increase of 25% over the 1951 assessed valuation was added thereto in order that the 1952 assessed valuation thereon would be equalized with those that had been reappraised;

"(c) That on all other real property within the said Pueblo County the reappraised values were used where made; in the Aberdeen area of Pueblo, the assessed valuations were increased such an amount as would equalize their value with that of similar property within the said City of Pueblo; on lands other than those abovementioned, the 1951 assessed valuations were used by me in making up the 1952 assessment roll for Pueblo County;"

From the foregoing it will be noted that all personal property was valued in accordance with the March 1st, 1952, appraisal; that an unspecified portion of the lands in the business district had been reappraised, from which it was determined that the values thereby fixed were such as to require, as a mathematical calculation, a twenty-five per cent increase over the 1951 valuation on lands not reappraised, in order to equalize same with those that had; that on all other real estate, reappraised values were used where made, and in the Aberdeen area, the valuations were increased in such "amount as would equalize their value with that of similar property." It is clear that, in the absence of actually completed reappraisal itself, every effort was made to attain equality and uniformity. From such calculations, based on the experience of reappraisal, the final result doubtless closely approximated what would have been shown by the completed reappraisal.

On behalf of complainants it is contended that the assessment valuations fixed by the assessor in the manner above detailed are violative of the constitutional requirement of equality and uniformity, because based in part upon reappraisal, part on horizontal increase, and part on estimate. This is not a fair statement, since the assessor makes clear in his affidavit that where valuation was fixed by either horizontal raise or estimation, this was done with reference to similar property on which valuations already had been determined pursuant to the reappraisal program. He was forced to operate under difficult circumstances, which would not again reoccur. To have followed 1951 standards of valuation would certainly have been out of line. To have adopted 1951 valuations as a basis and applied a uniform horizontal raise thereto, it is equally apparent, would have resulted in his valuations being out of harmony with those in counties where the new standards had been, or were being, applied. Far from being capricious, arbitrary and unreasonable conduct on the part of the

assessor, it would seem that he made every effort at equality and uniformity. He was required to compile his tax roll, as fairly as he knew how to accomplish it. This apparently he did.

■ ■ It is not alleged or contended on behalf of complainants that the assessor picked out the individual property of any one of them and arbitrarily placed an excessive value thereon, or that his actions were influenced by any personal bias, fraud, ill will, caprice, or desire to be oppressive. The complaint is, that by the method employed by the assessor, properties of a certain classification, particularly recently constructed dwellings, were assessed at excessive valuations, whereas other properties of different classification were valued too low. It is not shown that this result would not have obtained had the reappraisal been completed and valuations determined in accordance therewith. In either event, "To justify judicial interference, the classification adopted must be based upon an invidious and unreasonable distinction or difference with reference to *similar kinds of property.* (Citing cases.) *Second,* that the uniformity required is a uniformity of taxes, not a uniformity of procedure, or of rules or regulations to govern the levy thereof. To demand absolute uniformity in the latter regard would tend strongly to defeat the prior and supreme requirement. The constitution leaves this matter with the legislature, simply directing that the regulations shall be made by general law, and shall secure just valuations." *People ex rel. Iron Silver Mining Co. v. Henderson,* 12 Colo. 369, 375, 21 Pac. 144. (Emphasis first above indicated is supplied.)

■ The method or plan by which valuations for taxation purposes is to be formulated is not for determination by the courts. "The mode of making assessments is a legislative function." *Fairlamb v. Bowle, supra.* "In the absence of proof of caprice or dishonesty, and in the case at bar there is no evidence tending to show either,

the usual presumptions of regularity on the part of the officers must be indulged. *Colorado Tax Commission v. Midland Terminal Ry. Co.,* 93 Colo. 108, 24 P. (2d) 745, and authorities there cited." *Colorado Tax Commission v. Colorado Central Power Co.,* 94 Colo. 287, 290, 29 P. (2d) 1030.

 The evaluation of property for taxation, as determined by the assessor, is presumed to be right (*People ex rel. Hallett v. Board of County Commissioners,* 27 Colo. 86, 90, 59 Pac. 733), and one who attacks it has the burden of affirmatively and clearly showing that it is manifestly excessive, fraudulent or oppressive. *Phillips v. Board of County Commissioners,* 83 Colo. 82, 86, 262 Pac. 523; *Singer Mfg. Co. v. Denver,* 46 Colo. 50, 53, 103 Pac. 294; *Union Pacific Railroad Co. v. Hanna,* 73 Colo. 162, 171, 214 Pac. 550. "The presumption of official regularity applies to all of his acts" (*Denver v. Lewin,* 106 Colo. 331, 342, 105 P. (2d) 854), and mere error of judgment or overvaluation is not sufficient to overthrow his determination, "nor is exactness necessary in working out a relative uniformity," Id., 106 Colo. 341, between properties of the same general classification, page 347.

The conclusion is inescapable that the assessor was under duty to assess all taxable property for taxation in 1952, regardless of whether the "reappraisal" thereof had been completed; that although he was not required to await completion of reappraisal before making up his tax roll, he was under obligation nevertheless, in the interest of uniformity, to determine his valuations in conformity with reappraisal standards in so far as this might reasonably be accomplished under the circumstances; and that, these duties having been performed, his actions in that behalf are clothed with the presumption of being correct and regular. It equally is manifest that to overcome this presumption would require a clear showing of illegality and that, for all purposes here, we must assume the regularity and validity of the 1952 as-

sessment roll of Pueblo county as returned by the assessor.

## II.

Counsel representing complainants concede that where the assessor regularly performs his duty in completion of the assessment roll and transmittal of an abstract thereof, and where he and other officials publish proper notices and perform their respective duties in all respects in the manner and by the dates as provided by law, recourse by objecting taxpayers is confined to certain statutory procedures, reference to which will hereinafter be made. They contend, however, that in this case they were unable to follow the steps of statutory procedure and were actually prevented from so doing for the reasons: (1) That there was no assessment roll; and (2) that the giving of certain notices by particular dates is mandatory and is essential to a valid tax assessment, and that said notices were not in conformity with the statutes.

The first statute called to our attention in this connection is section 114, chapter 142, '35 C.S.A., as amended by section 14, chapter 158, S.L. 1943, page 498, which provides in general, that a taxpayer having a grievance for any of several reasons, such as if, in his opinion, his property "has been assessed too high" or "illegally assessed," may appear before the assessor and state his complaint. To this end, where the assessor has changed the valuation given in his schedule by the taxpayer, he "shall, prior to the first day of July," mail notice of such change to the taxpayer, "and shall give notice, by publication in at least one issue of a paper * * * on a day therein named, he will sit to hear any and all objections to the assessment roll * * *. The assessor shall continue such hearing from day to day, and time to time until all grievances shall be heard," and "shall conclude all hearings before the first day of the meeting of the county board of equalization."

It is conceded that none of complainants' schedules

were changed, and that none of them were entitled to written notice to be mailed prior to July first. The assessor published a notice that he would sit on July 7, 1952, to hear objections to the tax roll, and that said hearing would be continued from day to day until July 21, 1952, when the county board of equalization would meet. No fault is found with the notice other than it was not published until July 3, 1952. Reference also is made to section 293, chapter 142, '35 C.S.A., which reads as follows: "The county clerk shall give at least ten days' notice by publication, or by posting written or printed notices of the time and place of the first meeting of the county board of equalization."·

Pursuant to the provisions of section 292, chapter 142, '35 C.S.A., as amended by section 19, chapter 158, S.L. '43, page 502, the county board of equalization is required to meet on the third Monday in July, which, in 1952, was July 21st, ending said meetings "on or before the twenty-eighth day of July." Notice was published, but complaint is directed thereto in that it was not published until July 14th, and also that it mistakenly stated that the board meetings would start on July 14th, 1952, instead of the correct date of July 21st.

With respect to the assessor's notice under section 114, supra, the statute is not clear when the same shall be published, but assuming that such publication should be made on or before July first, is this a mandatory requirement? Also, how about the ten-day notice of the first meeting of the board of equalization? Are these such vital requirements that, in the absence of strict compliance therewith, the whole tax levy becomes ipso facto void? In *Tallon, Treasurer v. Vindicator Consolidated Gold Mining Co.*, 59 Colo. 316, 328, 149 Pac. 108, our court stated that: "Whether statutes involving the constructive steps incident to taxation are mandatory or directory depends upon whether or not the directions given the officers are for the benefit of the taxpayer, to give him *notice and an opportunity* for a hear-

ing, or for any other *purpose important* to him." (Emphasis supplied.) With general approval in principle, the Tallon case has been cited in subsequent decisions of this court: (1) In the case of *Colorado & Southern Railway Co. v. Board of Commissioners,* 70 Colo. 8, 11, 196 Pac. 331, to the effect that section 5760, R.S. 1908 (now section 291, chapter 142, as amended by chapter 159, S.L. 1943, p. 505) concerning the levy of taxes by a date certain, is directory only. (2) In the case of *MacGinnis v. Denver Land Co.,* 90 Colo. 72, 6 P. (2d) 919, there were involved certain statutes pertaining to the times and manner by which the tax commission and state board of equalization should perform various duties, the plaintiff in that case contending, as do complainants in this case, that all such statutes are mandatory. Mr. Justice Alter (page 75 of the official report) very appropriately said: "Plaintiff makes no attempt to show that it was prejudiced or injured by the state board's failure to adopt its construction of the statutes." (3) In *Tarabino Real Estate Co. v. Sandoval, Assessor,* 115 Colo. 336, 340, 173 P. (2d) 459, it was held that the directions fixed in the statute for the time of holding meetings of the county board of equalization are mandatory; but nothing is said about the giving of notice.

In the instant case it is not asserted that the assessor was not available at his office between July 7 and 21, 1952, nor that the county commissioners failed to sit as a board of equalization during the period specified in the statute. In this connection only the regularity of notice is attacked. In *Duggan v. McCullough,* 27 Colo. 43, 47, 59 Pac. 743, wherein arose the question of the effect of error in the notice of the meeting of the county board of equalization, the notice having recited the wrong year, our court held the general rule to be that, "an owner, who has no grievance cannot complain that a proper notice of the meeting of the board for the purpose of equalizing was not given." The respondents, county officials, set forth in their return to our order to

show cause, that they actually sat at the times required by statute for the purpose of hearing complaints, but that none of complainants appeared before them. This statement stands unchallenged by complainants, but they say that they did not appear to present objection for the reason that they could not have objected had they appeared, because the "reappraisal" had not been completed, on account of which there was no assessment roll. Under such circumstances it is manifest that errors in the notices could not have been in any wise prejudicial to complainants, since the reason assigned for their nonappearance is neither failure of notice nor nonperformance of duty by the officers. The statutes fixing times for meetings and other functions of state officials, respondents herein, are merely directory; the alleged noncompliance therewith on the part of said officials being matters nonprejudicial to complainants, they are not subject to attack on their part. *MacGinnis v. Denver Land Co., supra,* and cases therein cited.

Having previously herein stated that the completion of the "reappraisal" was not a prerequisite to the levy of a valid tax for the year 1952, we now come to the point of whether the work of assessment had progressed to the point, by the seventh day of July, and subsequent thereto, that there was a sufficiently completed *tax roll* available, by means of which any taxpayer could have ascertained the valuation at which his property had been assessed. Respondents, county officials, maintain that there was, and the respondent assessor by his sworn affidavit (Exhibit 1) individually goes further to state, after first setting forth a copy of his published notice of the time when and place where he would sit to hear complaints, "That at all times mentioned in said notice he had before him the assessment roll of the property subject to assessment and taxation within the County of Pueblo." He then describes the method by which the valuations were ascertained (quoted supra); that he sat to hear complaints from July 7 to July 21; that none

came to make complaint; and that, for this reason "no appeals were taken to the board of county commissioners sitting as a board of equalization * * *." In their separate, verified return the county officers state, "that though the assessment roll had not been completely and formally prepared, the assessed value of all the property in Pueblo county had been determined and appeared on the books of the assessor so that any taxpayer by inquiring at the office of the assessor could learn the amount at which his property had been assessed for 1952."

██ Under the circumstances above detailed, exhaustion of the administrative remedies as provided by the statute, particularly section 114, chapter 142, supra, and section 116, chapter 142, supra, as amended by section 1, chapter 203, S.L. '45, page 549, is a requisite precedent to the maintenance of a court action. Notwithstanding the sweeping charges presented on behalf of complainants, covering every objection conceivable, when carefully analyzed, they simmer down to the single contention that their property, and that of others in the same classification, was excessively valued for tax assessment in 1952; their position here, bears close identity to that presented on behalf of plaintiffs in error in *Miller v. Board of County Commissioners,* 92 Colo. 425, 427, 21 P. (2d) 714, and they are bound by rules therein announced. The assessment is clearly not illegal; if erroneous, or excessive, the right to relief has been lost through failure to pursue the proper statutory remedy. See, also, *Bordner v. Board of County Commissioners,* 92 Colo. 81, 83, 18 P. (2d) 323; *People ex rel. Winbourn v. District Court,* 87 Colo. 316, 287 Pac. 849; *First National Bank of Greeley v. Board of County Commissioners,* 264 U. S. 450, 44 Sup. Ct. 385, 68 L. Ed. 784; *Tarabino Real Estate Co. v. Sandoval, supra.* Other cases to the same effect might be cited, but we deem these sufficient.

III.

Other intriguing legal issues presented in this matter

might be pursued with interest, but to do so, would not change the result. We have, however, given close study to all phases of the case and our failure to discuss these points is no indication of inattention to them.

By this opinion we confine ourselves to the law applicable to the case as presented, and do not hereby desire to be understood as expressing either approval or disapproval of the tax reappraisal over which this case arose. Assuming, without adoption, that the policy and plan of the reappraisal program is entitled to all the condemnation complainants heap upon it, that is a matter to be worked out within the framework of the law by the constituted administrative officials, subject to the will of the legislature to supply further corrective measures, should it see fit. The courts may not dictate policy, nor go beyond the boundaries of existing law, in any attempt to afford relief.

The requested writ is denied and our rule to show cause discharged.