| Claim # | Description | UCRS | MHCRS | Vogt |
|---|---|---|---|---|
| | | | Trial Court Ruling on Motion to Dismiss | |
| 1 | Title VII Retaliation | Granted | N/A | N/A |
| 2 | Breach of Fiduciary Duty | Granted | Granted | N/A |
| 3 | Interference w/Economic Advantage | Granted | Granted | Granted |
| 4 | Interference w/Contract | N/A | Granted | Granted |
| 5 | Breach of Contract | Denied | N/A | N/A |
| 6 | Promissory Estoppel | Denied | N/A | N/A |
| 7 | Battery | N/A | N/A | Denied |
| 8 | Assault | N/A | N/A | Denied |
| 9 | Outrageous Conduct (no 54(b) cert.) | Granted | Granted | Denied |
| 10 | Breach of Fiduciary Duty by Person in Trust | N/A | N/A | Denied |
| 11 | Negligent Hiring | Granted | Granted | N/A |
| 12 | Negligent Supervision | Granted | Granted | N/A |
| 13 | Negligent Retention | Granted | Granted | N/A |

**AMAX, INC., a New York corporation, Climax Molybdenum Company, a Delaware corporation, Petitioner–Appellant and Cross–Appellee,**

v.

**GRAND COUNTY BOARD OF EQUALIZATION, Nancy Anders, as Grand County Assessor, Respondent–Appellee,**

**Mary Huddleston, as State Property Tax Administrator, Respondent–Appellee and Cross Appellant.**

**No. 93CA0244.**

Colorado Court of Appeals, Div. V.

Sept. 8, 1994.

As Modified on Denial of Rehearing Oct. 13, 1994.

Certiorari Granted April 3, 1995.

Gorsuch, Kirgis, Campbell, Walker, Malcolm M. Murray, Deborah H. Bennett, Maureen H. Juran, Denver, for petitioner-appellant and cross-appellee.

Grand County Atty., Anthony J. DiCola, for respondent-appellee.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Larry A. Williams, Asst. Atty. Gen., Denver, for respondent-appellee and cross-appellant.

Opinion by Judge NEY.

Plaintiffs, Amax, Inc., and Climax Molybdenum Co. (taxpayers), appeal from the summary judgment entered in a tax valuation case in favor of defendants, Grand County Board of Equalization, Grand County Assessor, and State Property Tax Administrator (authorities). The State Property Tax Administrator cross-appeals. We affirm in

part, reverse in part, and remand with directions.

The taxpayers own and operate a molybdenum mine in Grand County. Construction of the mine began in the 1960s and was completed in 1976. During that time, the taxpayers built the mine shaft, tunnels, and related facilities. In addition, the taxpayers drilled and blasted the ore body in preparation for mining.

In addition to the mine operation, the taxpayers operate a milling facility which is connected to the mine by a tunnel. The ore extracted in the mine is transported through the tunnel to the milling facility, where the ore is crushed and processed to a concentrate. It is at this point, when it has been processed, that the ore is sold and a market value is thereby established for it.

Colo.Const. art. X, § 3(1)(b) requires that valuation for assessment for producing mines must be a portion of the actual annual or actual average annual production of the mine, based upon the value of the *unprocessed* material therefrom.

The constitutional requirement for valuing mines based on the annual production value of the unprocessed material is implemented by § 39–6–101, et seq., C.R.S. (1982 Repl.Vol. 16B). Pursuant to that article, mines are categorized as producing or non-producing. Section 39–6–104, C.R.S. (1982 Repl.Vol. 16B). Different valuation systems are used for the different categories of mines. *Compare* § 39–6–106, C.R.S. (1982 Repl.Vol. 16B) *with* § 39–6–111, C.R.S. (1982 Repl.Vol. 16B). Valuation of improvements, machinery, and tunnels are covered by other sections of the article. *See* §§ 39–6–107 and 39–6–112, C.R.S. (1982 Repl.Vol. 16B).

A producing mine is defined as one with gross proceeds over $5,000 in the preceding calendar year. Section 39–6–105, C.R.S. (1982 Repl.Vol. 16B). The taxpayers' mine has been a producing mine since 1976 and is valued for taxation purposes according to the statutory scheme in § 39–6–106, C.R.S. (1982 Repl.Vol. 16B), which is commonly referred to as "mine by proceeds."

Section 39–6–106(1), C.R.S. (1982 Repl.Vol. 16B) requires the owner of a producing mine to file an annual statement containing information on the mine's production, from which the valuation for taxation is calculated. The mine is valued in each of two ways: gross proceeds and net proceeds. The assessor must value the mine at the higher of twenty-five percent of the gross proceeds or the net proceeds. Section 39–6–106(2), C.R.S. (1982 Repl.Vol. 16B). Thus, the statutory scheme requires computation of both the gross proceeds (of extracted but unprocessed ore) and the net proceeds (unprocessed ore minus the cost of extraction).

Section 39–6–106, C.R.S. (1982 Repl.Vol. 16B), provides in pertinent part that:

(1) Every person owning or operating any mine classified as a producing mine shall ... file with the assessor ... a statement showing:

. . . .

(d) The number of tons of ore extracted therefrom during the calendar year immediately preceding;

(e) The gross value from production of the ore extracted during said calendar year, which means and includes the amount for which ore or any products derived therefrom were or could be sold by the owner or operator of a mine;

(f) The costs of extracting such ore, excluding the compensation of any officer or agents not actively and continuously engaged in or about the mine;

(g) The costs of treatment, reduction, transportation, and sale of such ore or any products derived therefor;

(h) The gross proceeds from production of such ore, which means and includes the value of the ore immediately after extraction, which value may be determined by deducting from the gross value all costs of treatment, reduction, transportation, and sale of such ore or any products derived therefrom;

(i) The net proceeds from production of such ore, which means and includes the amount determined by deducting from the gross proceeds all costs of extracting such ore.

This scheme, in essence, defines the gross value as the market value of the material after it has been extracted and processed. The statutory scheme also requires determination of (1) the costs of treatment, reduction, transportation, and sale, to be deducted from gross value to determine gross proceeds, *i.e.*, the amount the processor would pay to the mine operator (value of unprocessed ore); and (2) the costs of extracting the ore, to be deducted from gross proceeds to determine net proceeds, the taxable value of the material.

The statutory scheme is directly applicable to the manner the taxpayers operate their mine. Only the processed ore is sold, creating the gross value defined in § 39–6–106(1)(e), C.R.S. (1982 Repl.Vol. 16B). To calculate the gross proceeds, *i.e.*, the value immediately after extraction (the unprocessed ore), the costs of processing are deducted from the gross value. Section 39–6–106(1)(h), C.R.S. (1982 Repl.Vol. 16B). Then net proceeds are calculated by deducting the costs of extraction from the gross proceeds. Section 39–6–106(1)(i), C.R.S. (1982 Repl.Vol. 16B).

■ This scheme may be expressed in formulas for computation purposes. First, the gross value as defined as § 39–6–106(1)(e):

gross value = sale price of *processed* ore.

Next, the gross proceeds, the value of the *unprocessed* but extracted ore, are calculated pursuant to § 39–6–106(1)(h):

gross proceeds = gross value − costs of processing the ore as defined in § 39–6–106(1)(g).

Finally, the net proceeds, the value of the unprocessed ore before extraction, are calculated pursuant to § 39–6–106(1)(i):

net proceeds = gross proceeds − costs of extracting the ore as defined in § 39–6–106(1)(f).

The taxpayers construed §§ 39–6–106(1)(h) and 39–6–106(1)(i) to allow deductions for amortized development costs incurred prior to 1976 and for depreciation of machinery, equipment, and facilities used in extracting and processing the ore in calculating both gross and net proceeds. They also construed the allowable deductions under § 39–6–106(1)(h) to include an allocated margin deduction attributed to the milling operation, for the profit that an independent milling operation would have charged.

The taxpayers also depreciated capital assets consisting of various above-the-ground machinery, equipment, personal property, and improvements from the costs of processing the ore.

The authorities disallowed all these deductions on the basis that they are not "costs of treatment, reduction, transportation, and sale" or "costs of extracting." When the tax assessor and the Board of Equalization disallowed each of these deductions, the taxpayers sought judicial review, pursuant to § 39–8–108(1), C.R.S. (1982 Repl.Vol. 16B), in the district court which affirmed the authorities' decisions. This appeal followed.

I.

The taxpayers contend that the trial court erred in disallowing as deductions the amortized development costs, depreciation of equipment and machinery, and the margin allocation in the calculation of both gross and net proceeds. They argue that "all costs" as used in § 39–6–106 is intended to be expansive and includes all costs of treatment, reduction, transportation, and sale of the ore. We conclude that the allowance or disallowance of these deductions depends on whether gross or net proceeds is being calculated and thus is related to whether the expense is incurred in the mining extraction or the processing operation.

Resolution of the issues raised by the taxpayers requires interpretation of the entire statutory scheme for valuing mines, § 39–6–101, et seq., C.R.S. (1982 Repl.Vol. 16B).

■ The primary goal of statutory construction is to carry out the intent of the General Assembly. Section 2–4–212, C.R.S. (1980 Repl.Vol. 1A); *Charnes v. Boom*, 766 P.2d 665 (Colo.1988). To discern legislative intent, the court must first look to the statutory language. *People v. Warner*, 801 P.2d 1187 (Colo.1990). The statute must be read as a whole, with words and phrases given their plain and ordinary meaning. *People v. District Court*, 713 P.2d 918 (Colo.1986). Strained or forced constructions of statutes

are disfavored. *Triad Painting Co. v. Blair*, 812 P.2d 638 (Colo.1991).

■ To interpret a comprehensive legislative scheme, the court must give meaning to all portions of the scheme and construe the provisions to further the legislative intent. *A.B. Hirschfeld Press, Inc. v. Denver*, 806 P.2d 917 (Colo.1991).

## A. All Costs

The first issue raised here is the meaning of the statutory term "all costs" in the determination of gross proceeds under § 39–6–106(1)(h), C.R.S. (1982 Repl.Vol. 16B), and of net proceeds under § 39–6–106(1)(i), C.R.S. (1982 Repl.Vol. 16B).

The taxpayers rely upon the legislative history of the rarely-amended statutory scheme of mining taxation and upon interpretation of "actual costs" by courts in other western mining states. Additionally, they point out that § 39–6–106(1)(f), C.R.S. (1982 Repl.Vol. 16B) specifically excludes as a deductible cost of extraction the compensation of certain officers or agents, thereby demonstrating the General Assembly's ability to narrow the scope of the statute when it wished to do so. Consequently, they argue that it is improper to imply other exclusions from the "all costs" language.

In 1965, the General Assembly repealed and re-enacted with amendments the previous statute. *See* Colo.Sess.Laws 1965, ch. 294, § 137–6–1 at 1101 (now codified as § 39–6–101, et seq., C.R.S. (1982 Repl.Vol. 16B)) Contrary to the taxpayers' argument, this repeal and re-enactment did not merely change the predecessor language of "actual costs" to "all costs," it added new words, phrases, and entire definitions. Therefore, we conclude that the re-enactment was intended to clarify, rather than change, the predecessor statute. *See Colorado Division of Employment and Training v. Parkview Episcopal Hospital*, 725 P.2d 787 (Colo.1986). As a result, we interpret the language "all costs" in § 39–6–106(1)(h) and § 39–6–106(1)(i), C.R.S. (1982 Repl.Vol. 16B), to refer to the costs defined in § 39–6–106(1)(f) and § 39–6–106(1)(g), C.R.S. (1982 Repl.Vol.

16B), in the context of either extracting or processing the ore.

The cases relied upon by the taxpayers in support of their proposition, primarily *State v. Tonopah Extension Mining Co.*, 49 Nev. 428, 248 P. 835 (1926), and *Anaconda Copper Mining Co. v. Junod*, 71 Mont. 132, 227 P. 1001 (1924), are of limited value. Although each discusses the meaning of "actual costs" in the context of valuing a mine, each discussion is dependent on the specific statutory scheme of the state in which the case arose.

In the Nevada case, the taxation scheme was premised on the fact that mining was a public use based on the philosophy that the mineral deposits were a benefit to all citizens. The tax statute at issue there qualifies the deduction of actual costs "as shall be deemed just, proper, and reasonable, and not introduced to deprive or defraud the state of any portion of its just revenue." *State v. Tonopah Extension Mining Co.*, 248 P. at 836.

In the Montana case, the tax statute allows deduction of "actual costs," and then in the next subsection also allows deduction of the "costs of construction, repairs and betterment of mines, and costs of repairs and replacements of reduction works." *Anaconda Copper Mining Co. v. Junod*, 227 P. at 1003.

■ Hence, these cases and the statutes construed in them are distinguishable from the situation here. Rather, in our view, the plain language of the Colorado statute gives the phrase "all costs" one meaning in § 39–6–106(1)(h), C.R.S. (1982 Repl.Vol. 16B), when it is qualified as "all costs of reduction, treatment, transportation, and sale of such ore," and the separate business of processing the ore; and gives it another meaning in § 39–6–106(1)(i), C.R.S. (1982 Repl.Vol. 16B), when it is qualified as "all costs of extracting such ore," a cost of the producing mine. Thus we agree with the trial court's definition of the term "all costs."

## B. Development Costs

■ The Colorado mine by proceeds statute, § 39–6–106(1), C.R.S. (1982 Repl.Vol. 16B), requires the owner or mine operator to

file a statement each year. That statement must show the number of tons of ore extracted from the mine in the preceding year, § 39–6–106(1)(d), C.R.S. (1982 Repl.Vol. 16B), and the gross value of the ore "extracted during said calendar year." Section 39–6–106(1)(e), C.R.S. (1982 Repl.Vol. 16B). Sections 39–6–106(1)(g), (h), and (i) all refer to "such ore." Hence, we conclude that these subsections, when read together, direct that only costs expended during the preceding year are to be deducted to calculate gross proceeds and net proceeds. Moreover, the constitutional provision that these statutes implement requires valuation on an annual basis. Thus, we conclude the trial court correctly determined the amortized development costs incurred before 1976 are not properly deducted in calculating the annual production, based on the value of the unprocessed ore.

### C. Margin Allocation

■ We agree with the taxpayers that a margin allocation should be deducted as part of the costs of treatment, reduction, transportation, and sale of the ore pursuant to § 39–6–106(1)(h), C.R.S. (1982 Repl.Vol. 16B).

The mine by proceeds statute contemplates valuation of the mine based on calculation of the gross proceeds, which is the gross value minus "all costs of treatment, reduction, transportation, and sale" of the ore. Section 39–6–106(1)(h), C.R.S. (1982 Repl. Vol. 16B). This statutory scheme contemplates the ore being processed, that is treated, reduced, transported, and sold, in a facility independent of the mine. *See Paxson v. Cresson Consolidated Gold Mining Milling Co.*, 56 Colo. 206, 139 P. 531 (1914).

If the ore is processed by an independent facility, the cost of processing would include a profit margin and clearly would be deductible under § 39–6–106(1)(h), C.R.S. (1982 Repl.Vol. 16B). We find nothing in the statutory language that would prohibit an integrated mining and milling facility such as the one operated by these taxpayers from including the same profit margin as a cost and deducting it to calculate gross proceeds. In so holding, we note that the profit margin

allocation may properly include as a factor depreciation for equipment, machinery, and other capital assets used by the processor in the processing operation.

Therefore, the cause must be remanded to the trial court for determination of the appropriate profit margin allocation which the taxpayers may deduct.

### D. Depreciation

We are not persuaded by the taxpayers contention that depreciation of machinery, equipment, or above-the-ground improvements may be deducted either in the calculation of the gross proceeds or in calculating the net proceeds. Although we noted in our discussion of the profit margin that the profit margin allocation may include depreciation, allowing depreciation as a discrete deduction in the calculation of gross proceeds would allow "double dipping."

We also are not persuaded that depreciation may be deducted in the calculation of net proceeds.

■ Section 39–6–107, C.R.S. (1982 Repl. Vol. 16B) provides:

All machinery and equipment, personal property, and improvements, except mining improvements within a mine excavation, shall be separately valued for assessment.

Because these items are to be separately valued for assessment, we conclude that the General Assembly did not intend to allow a deduction for depreciation of them in the separate valuation of the proceeds of the mine.

We note that the statement required by § 39–6–106(1), C.R.S. (1982 Repl.Vol. 16B) itemizes each component of the formulas used to calculate gross proceeds and net proceeds. Nothing in the definitions and formulas in § 39–6–106(1), either in the items included nor in the items excluded, mentions the items covered in § 39–6–107. Therefore, in order for § 39–6–107 to have meaning, we hold that machinery, equipment, personal property, and above-the-ground improvements are to be valued pursuant to § 39–6–107 and are not a factor under § 39–6–106.

In so holding, we are also not persuaded that the treatment of depreciation under generally accepted accounting principles is relevant to this statutory taxation scheme. Depreciation of capital assets is not a cost related to extraction, treatment, reduction, transportation, or sale of ore in any given calendar year. On the contrary, once a capital asset is acquired, it depreciates, in accounting terms, independent of its use or non-use.

## II.

The taxpayers assert that the trial court erred by pursuing an incorrect procedure of review. We do not agree.

As contemplated by § 39–8–108(1), C.R.S. (1982 Repl.Vol. 16B), taxpayers sought a trial *de novo* of their tax valuation in the district court. They now assert that the trial court misconstrued the nature of the proceeding and erroneously applied the standard appropriate for review of an agency action. They base this assertion upon the deference given by the trial court to the *Assessor's Reference Library,* which consists of procedural manuals and directives relied upon by the assessor in originally arriving at the challenged valuation.

 A trial *de novo* is a new trial at which there is taking of evidence as if there had been no previous trial. *B.C. Ltd. v. Krinhop,* 815 P.2d 1016 (Colo.App.1991). In such a trial concerning valuation for tax purposes, while the assessor's valuation is presumed to be correct, the taxpayer may overcome this presumption by a preponderance of the evidence. *City of Colorado Springs v. Investment Hotel Properties, Ltd.,* 806 P.2d 375 (Colo.1991).

 The trial court's consideration of the manuals in question was not inconsistent with the conduct of a trial *de novo.* Rather, when construing a statute, courts correctly afford deference to interpretation given the statute by the agency charged with its administration. *Howard Electrical & Mechanical, Inc. v. Department of Revenue,* 771 P.2d 475 (Colo.1989). Nevertheless, courts must interpret the law and are not bound by an agency interpretation that misconstrues it.

*El Paso County Board of Equalization v. Craddock,* 850 P.2d 702 (Colo.1993).

Thus, the trial court, thus, did not err in according deference to the agency's interpretation of the manuals' application of § 39–6–106, C.R.S. (1982 Repl.Vol. 16B). This deference was merely one component of the trial court's decision whether the taxpayers had overcome by a preponderance of the evidence the presumption that the assessor was correct. Although the trial court may have used some language from which an inference could be drawn that it was not conducting a *de novo* hearing, our review of the record and order establishes that the taxpayer was accorded a full *de novo* hearing.

## III.

On cross-appeal, the State Property Tax Administrator contends that the trial court erred in its conclusion that the manuals included in the *Assessor's Reference Library* were non-binding. We perceive no error.

Administrative agency rules are categorized as either legislative or interpretative. 2 K. Davis, *Administrative Law Treatise* § 7.8 (2d ed. 1979). Whether interpretative rules are binding is a complex issue, usually interrelated with the context of the specific rule, judicial enforcement, and considerations of justice. 2 K. Davis, *Administrative Law Treatise* § 7.21 (2d ed. 1979).

 Although the categories of legislative and interpretative rules have been developed relative to rules promulgated under the Administrative Procedure Act, we conclude that the *Assessor's Reference Library,* as mandated by § 39–2–109(1)(e), is analogous to an interpretative rule because it consists of interpretative manuals and materials. *See El Paso County Board of Equalization v. Craddock; Board of Assessment Appeals v. E.E. Sonnenberg & Sons,* 797 P.2d 27 (Colo.1990). However, this categorization alone does not resolve the issue of the effect of the manuals.

 Because interpretative rules serve the advisory function of explaining the meaning of a word or phrase and because an agency's own characterization of a particular rule offers some indication of the nature of the rule itself, the authority presented by a

rule may be persuasive, even if not binding. *See Regular Route Common Carrier Conference v. Public Utilities Commission,* 761 P.2d 737 (Colo.1988).

Unlike administrative agency rules and regulations promulgated under the Administrative Procedure Act, the *Assessor's Reference Library,* which consists of manuals, appraisal procedures, and instructions concerning methods of appraising and valuing property, is developed after consultation with the advisory committee to the property tax administrator. Section 39–2–109(1)(e), C.R.S. (1993 Cum.Supp.)

Although the Property Tax Administrator concedes that the committee has not submitted the manuals to the state board of equalization pursuant to § 39–2–131, C.R.S. (1993 Cum.Supp.), we note that the manuals have been in use and have been granted deference in several cases. *See El Paso County Board of Equalization v. Craddock, supra; Boulder County Board of Equalization v. M.D.C. Construction Co.,* 830 P.2d 975 (Colo.1992); *Golden Aluminum Co. v. Board of County Commissioners,* 867 P.2d 190 (Colo.App. 1993).

Our supreme court in *El Paso County Board of Equalization v. Craddock, supra,* held that the Property Tax Administrator's interpretation of a statutory provision, as contained in the *Assessor's Reference Library* was entitled to great weight because the subject involved called for technical expertise and the statutory language was susceptible to more than one reasonable interpretation. In so stating, the Court noted that it was not bound by an agency construction which either misapplied or misconstrued the law.

This conclusion applies equally to the situation before us. The *Assessor's Reference Library* is entitled to deference as interpretation of the tax laws, a subject involving technical expertise. Therefore, we affirm the trial court's ruling that the *Assessor's Reference Library* is not binding.

In so ruling, we reject the argument that *Board of Assessment Appeals v. E.E. Sonnenberg & Sons, supra,* requires a conclusion that the manuals are binding. Rather, *Son-*

*nenberg* indicates that the manuals are to be "utilized."

The judgment is affirmed in all respects with the exception of the resolution of the deductibility of profit margin allocation. On that issue, the judgment is reversed, and the cause is remanded to the trial court for determination of a method to calculate the profit margin allocation and allowance of that deduction.

STERNBERG, C.J., and ROTHENBERG, J., concur.