Mary HUDDLESTON, in her official capacity as State Property Tax Administrator, Petitioner/Cross–Respondent,

v.

GRAND COUNTY BOARD OF EQUALIZATION and Nancy Anders, in her official capacity as Grand County Assessor, Respondents/Cross–Petitioners,

and

Amax, Inc., a New York corporation; and Climax Molybdenum Company, a Delaware corporation, Respondents.

No. 94SC668.

Supreme Court of Colorado, En Banc.

March 11, 1996.

Rehearing Denied April 8, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, Larry A. Williams, First Assistant Attorney General, General Legal Services Section, Denver, for Petitioner/Cross–Respondent.

Anthony J. Dicola, Hot Sulphur Springs, for Respondents/Cross–Petitioners.

Gorsuch Kirgis, L.L.C., Malcolm M. Murray, William A. Keefe, Deborah J. Bennett, Denver, for Respondents.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Amax, Inc. v. Grand County Bd. of Equalization*, 892 P.2d 409 (Colo.App.1994). The court of appeals held that the State Property Tax Administrator's Assessors' Reference Library Manuals were not binding on the sixty-three county assessors, and that a mining company could deduct a margin allocation as part of the costs of treatment, reduction, transportation, and sale of ore when calculating gross proceeds under section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.). We reverse the judgment of the court of appeals.

I.

The respondents, Amax, Inc., and Climax Molybdenum Co. (collectively referred to as Climax), own the Henderson Mine and Mill, part of which is located in Grand County. Under section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.), Climax is required to submit an annual statement to Nancy Anders, the Grand County Assessor (Assessor), itemizing the mine's annual production of ore and its costs of extraction, treatment, reduction, transportation, and sale of ore.

In 1988, the Assessor refused to allow Climax to deduct $3,270,270.00 as a cost of extracting ore on its annual statement. In support of its deduction, Climax claimed that in 1938 then-Governor Ralph Carr allowed Climax to adjust its payment of taxes by including a ten percent potential profit margin as a cost of extracting ore. Although there is no documentation of this agreement, Climax apparently took the deduction, referred to in the record as the "Governor Carr adjustment," from 1938 to 1987. Climax did not challenge the Assessor's 1988 decision rejecting its $3.2 million deduction.

In 1989, the Assessor valued the Henderson mine using the State Property Tax Administrator's Assessors' Reference Library Manuals (manuals). The Assessor refused to allow Climax to take a deduction which appeared to be equivalent to the old "Governor Carr adjustment" but now was described by Climax as a margin allocation.

Under that description, the sum of $19,557,-480.00 was claimed as a cost of treatment of ore. Climax appealed the Assessor's decision to the Grand County Board of Equalization (Board), and its appeal was denied.

Climax initiated this action in the district court seeking review of the Board's decision. Climax contended in that court and contends here that, as an integrated mining and milling facility, it should be allowed to deduct a hypothetical profit percentage or margin allocation in its computation of the value of the ore between the mining and milling process. The Board asserts that the $19.6 million deduction claimed by Climax was properly rejected because the statute only allows actual costs as deductions not hypothetical costs such as the margin allocation.

The district court granted summary judgment in favor of the Board. Although it held that the manuals are not binding on the county assessors, the court concluded that a margin allocation cannot be deducted as part of the costs of treatment, reduction, transportation, and sale of ore pursuant to section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.).

The court of appeals affirmed the district court's finding that the manuals are not binding on the county assessors, but reversed the district court's decision concerning the margin allocation. It held that the margin allocation was deductible as part of the costs of treatment, reduction, transportation, and sale of ore pursuant to section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.), and we granted certiorari[1]. We conclude that the State Property Tax Administrator's Assessors' Reference Library Manuals are binding on the sixty-three county assessors, and that a margin allocation cannot be deducted as part of the costs of treatment, reduction, transportation, and sale of ore pursuant to section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.).

## II.

Although the court of appeals affirmed the district court's judgment in all respects except the margin allocation, *Amax*, 892 P.2d at 417, its analysis of the manuals issue differed significantly from that of the district court. The court of appeals did not address the issue on which we granted certiorari, *i.e.*, whether the manuals are binding on the sixty-three county assessors. Rather, the court of appeals considered whether the manuals are binding on a court which is reviewing a property tax decision made by a county board of equalization.

We agree with the court of appeals that it is for the courts to decide issues of law and that reviewing courts are not bound to follow the statutory interpretations reflected in the manuals. *El Paso County Bd. of Equalization v. Craddock*, 850 P.2d 702, 704 (Colo.1993) ("An administrative agency's construction [of a statute] should be given appropriate deference but is not binding on the court."). Judicial deference is appropriate when the statute before the court is subject to different reasonable interpretations and the issue comes within the administrative agency's special expertise. We found in *Craddock* that the Property Tax Administrator's interpretation was entitled to deference and was persuasive in deciding the case. *Id.* at 705.

Finding that the Property Tax Administrator's manuals are not binding on reviewing courts does not resolve the binding effect of the manuals on the county assessors. Based on the plain statutory language and the constitutional requirement of uniformity, we conclude that the manuals are binding on the county assessors.

The legislature created the position of Property Tax Administrator to oversee the administration of the state property tax valuation system. § 39–2–109, 16B C.R.S. (1982 & 1989 Supp.). Section 39–2–109 provides:

(1) *It is the duty of the property tax administrator,* and he shall have and exercise authority:

1. We granted certiorari on the following two issues:
   1. Whether the assessors of the sixty-three counties are required to utilize, and are bound by, the Property Tax Administrator's manuals.
   2. Whether the court of appeals erred, as a matter of law, when it held that a margin allocation is a proper deduction under the statutes of this State.

. . . .

(e) *To prepare and publish* from time to time *manuals* . . . concerning methods of appraising and valuing land . . . *and to require their utilization by assessors in valuing and assessing taxable property.* . . . Such manuals . . . shall be subject to legislative review, the same as rules and regulations, pursuant to section 24–4–103(8)(d).

§ 39–2–109, 16B C.R.S. (1982 & 1989 Supp.) (emphasis added). The statute does not define the phrase "to require their utilization."

█ In interpreting a comprehensive legislative scheme, we must give meaning to all of its parts and construe the statutory provisions to further the legislative intent. *A.B. Hirschfeld Press, Inc. v. City & County of Denver*, 806 P.2d 917 (Colo.1991). Our goal is to ascertain and to give effect to the legislature's intent. In order to ascertain the legislative intent, we first look to the statutory language in question. *Colorado State Bd. of Medical Examiners v. Saddoris*, 825 P.2d 39 (Colo.1992). Where statutory language is clear and unambiguous, as it is here, there is no need to resort to interpretive rules of statutory construction.

The language authorizing the Property Tax Administrator "to require [the manuals'] utilization" by the county assessors is simple and straightforward. Construed as written, the statute authorizes the Property Tax Administrator to require the sixty-three county assessors to utilize the manuals in valuing and assessing taxable property.

The statutory requirement implements the mandate of the Colorado Constitution that all property tax valuations operate equally and uniformly upon all those affected. Colo. Const. Art. X, § 3(1)(a), 1A C.R.S. (1995 Supp.); *see also District 50 Metro. Recreation Dist. v. Burnside*, 167 Colo. 425, 448 P.2d 788 (1968). Section 3(1)(a) of Article X states:

*Each property tax levy shall be uniform upon all real and personal property* not exempt from taxation under this article. . . . *The actual value* of all real and personal property not exempt from taxation under this article *shall be determined under general laws, which shall prescribe*

*such methods and regulations as shall secure just and equalized valuations* for assessments of all real and personal property not exempt from taxation under this article.

Colo. Const. Art. X, § 3(1)(a), 1A C.R.S. (1995 Supp.) (emphasis added).

Here, the legislature created an administrative office and assessment process to ensure uniformity among the sixty-three counties. Without the uniform use of the manuals, county assessors would have no standard process to value the mines and the Property Tax Administrator would be unable to determine whether the county assessors had valued the property correctly. Hence, we conclude that the manuals are binding on the sixty-three county assessors. The court of appeals erred in affirming the district court's holding on this issue.

### III.

Next, we must determine whether a margin allocation can be deducted as part of the costs of treatment, reduction, transportation, and sale of ore under section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.).

█ The Property Tax Administrator asserts that the $19.6 million margin allocation deducted by Climax is a purely hypothetical figure and does not represent any out-of-pocket expense to Climax. According to the Property Tax Administrator, Climax was permitted to, and did, deduct all of its aboveground costs of treatment, reduction, transportation, and sale related to the ore. The margin allocation is seen by the Property Tax Administrator as an additional deduction, an arbitrary sum of money which is above and beyond actual costs. Climax does not dispute the characterization of its margin allocation as a hypothetical figure not representing direct costs. It asserts that the margin allocation is properly deductible because if it utilized another company to mill its ore, it would pay a sum which would include the milling company's profit. Since Climax is an integrated mining and milling company, it concludes that it should be able to deduct an amount which is equivalent to the profit fac-

tor which would be charged by a separate milling company.

The "mine-by-proceeds" valuation process is designed to determine the value of the producing mines for property tax purposes. Article X, section 3(1)(b) of the Colorado Constitution requires that producing mines be valued on the basis of unprocessed ore produced annually. The constitution provides:

> [T]he valuation for assessment for producing mines, as defined by law, and lands or leaseholds producing oil or gas, as defined by law, *shall be a portion of the actual annual or actual average annual production therefrom, based upon the value of the unprocessed material,* according to procedures prescribed by law for different types of minerals.

Colo. Const. Art. X, § 3(1)(b), 1A C.R.S. (1995 Supp.) (emphasis added).

The valuation amount is determined by deducting the costs of treatment, reduction, transportation, and sale from the gross value of the unprocessed ore. § 39–6–106, 16B C.R.S. (1982 & 1993 Supp.).[2] The county assessor must value the unprocessed ore at twenty-five percent of the gross proceeds or one-hundred percent of the net proceeds, whichever is higher. Section 39–6–106 provides:

> (1) Every person owning or operating any mine classified as a producing mine shall, no later than the fifteenth day of April of each year, prepare, sign under the penalty of perjury in the second degree, and file with the assessor of the county wherein such mine is located a statement showing:
>
> . . . .
>
> (e) The gross value from production of the ore extracted during said calendar year, which means and includes the amount for which ore or any products derived there-

from were or could be sold by the owner or operator of a mine;

> (f) The costs of extracting such ore, excluding the compensation of any officer or agents not actively and continuously engaged in or about the mine;
>
> (g) The costs of treatment, reduction, transportation, and sale of such ore or any products derived therefrom;
>
> (h) *The gross proceeds* from production of such ore, which means and includes the value of the ore immediately after extraction, which value *may be determined by deducting from gross value all costs of treatment, reduction, transportation, and sale of such ore* or any products derived therefrom;
>
> (i) *The net proceeds* from production of such ore, which *means* and includes the *amount determined by deducting from the gross proceeds all costs of extracting* such ore.
>
> . . . .
>
> (2) On the basis of the information contained in such statement, the assessor shall value such mine for assessment at an amount equal to twenty-five percent of the gross proceeds, but if the net proceeds exceed twenty-five percent of the gross proceeds, then such mine shall be valued for assessment at the amount of such net proceeds.

§ 39–6–106, 16B C.R.S. (1982 & 1993 Supp.) (emphasis added).[3] The statute does not provide a definition of the phrase "all costs."

However, the Property Tax Administrator's manuals set forth descriptions of the terms listed in section 39–6–106, 16B C.R.S. (1982 & 1993 Supp.). Section VI of the manuals provides:

> a. *Treatment Costs*—costs incurred subsequent to mining but before sale. They include costs of crushing, grinding, concentrating, separating, agglomeration or any

---

2. The full text of this statutory section is attached to this opinion as Appendix A. The relevant portions are included in the text of this opinion.

3. The statute addressing property tax valuation of producing mines was amended in 1994. The statute now defines the term "costs" and provides:

    (b) *"Costs" does not include:*

(I) *Any amounts designated as profit or margin* which are attributable to any part of the treatment, reduction, transportation, or sale of the ore.

§ 39–6–106(1.7)(a)(II)(b), 16B C.R.S. (1994) (emphasis added). However, this amendment does not apply to the case before us.

other form of processing performed prior to smelting. *If the mining company does not own the mill or have any interest in it, then use the contract price paid for milling service.*

. . . .

*Any other costs or expenses* not directly related to extraction, transportation, treatment, reduction, or sale of the ore, concentrate, or product *cannot be deducted.*

State Property Tax Administrator's Assessors' Reference Library Manuals, Volume 3, § VI (emphasis added). Thus, it is clear that under the manuals, Climax's margin allocation could not be deducted. The question is whether the manuals properly interpret the constitution and the statute.

Climax contends that a margin allocation is a valid deduction as an ore treatment cost under the statute. Climax maintains that the cost of treatment includes a hypothetical profit that would have been a cost had the Henderson mine not used its own milling facility. In support, Climax relies, by analogy, on *Douglas County Bd. of Equalization v. Fidelity Castle Pines*, 890 P.2d 119 (Colo. 1995), a case concerning the valuation of vacant land for purposes of property tax. In *Fidelity Castle Pines*, we held that the "cost of development" in section 39–1–103(14)(b), 16B C.R.S. (1994), included both direct and indirect or "soft" costs. Indirect costs such as marketing, overhead, and profit were held to be properly deducted from the final selling price of an undeveloped lot in order to calculate the current market value of the land. *Id.* at 130.

Climax argues that just as the term "cost of development" was found to be ambiguous in *Fidelity Castle Pines* so too should the term "costs" be found to be ambiguous in the present case. Such ambiguity, Climax argues, should be construed in its favor and the deduction allowed. We are not persuaded by this argument. Here, we are dealing with a very different kind of property with its own taxation scheme under the constitution and statutes.

■ The history of the mine tax valuation system supports the Property Tax Administrator's position and shows that a hypothetical profit or margin allocation is not deductible. Under the Constitution of 1876, taxation of mines was prohibited for ten years and thereafter was permitted as provided by law. Colo. Const. Art. X, § 3 (1876);[4] *Tallon v. Vindicator Consol. Gold Mining Co.,* 59 Colo. 316, 329, 149 P. 108, 113 (1915). After the constitutional exemption expired in 1886, valuation of mines was recognized as essential for taxation but difficult to ascertain. "At best, the true value of mining claims can only be approximated." *In re House Bill No. 270,* 9 Colo. 635, 639, 21 P. 476, 477 (1886). This was so because the value of mining property lay in the unmined ore which could only be approximated and could not be calculated with absolute certainty or mathematical precision. *Id.*

By way of interrogatories, the legislature asked the court to consider several pieces of proposed legislation which would have established different methods to value and tax mines. All were held unconstitutional. *Id.* at 635, 21 P. at 476. The legislature then developed the taxation scheme based on the annual gross proceeds which was found to be constitutional in *People ex rel. Iron Silver Mining Co. v. Henderson,* 12 Colo. 369, 21 P. 144 (1888), and which largely remains in effect today.[5] The 1887 Act valued mines whose production exceeded $1,000.00 at a percentage of one-fifth of the annual gross proceeds. *Id.* at 371, 21 P. at 146. In 1902, the Act was amended to provide,

that all mines whose gross production exceeds $5,000.00 per annum, should be classified as producing mines, and all others as non-producing, and that all producing

---

**4.** The 1876 Constitution provided that,

mines and mining claims bearing gold, silver, and other precious metals, (except the net proceeds and surface improvements thereof,) shall be exempt from taxation for the period of ten years from the date of the adoption of this Constitution, and thereafter may be taxed as provided by law.

Colo. Const. Art. X, § 3 (1876).

**5.** The current constitutional provision, Article X, section 3(1)(b), mandates that mines be valued on the basis of annual ore production which is the same concept approved in *Henderson.* The text of Article X, section 3(1)(b) is set forth at page 8 in the text of this opinion.

mines should, for taxation, be valued at a sum equal to one-fourth the gross proceeds for the preceding year, unless the net proceeds exceeded one-fourth [of] the gross, in which event the mine should be valued at an amount equal to the net proceeds. *Tallon,* 59 Colo. at 330, 149 P. at 113.[6]  In 1913, the legislature again amended the law setting the value of each producing mine at a sum equal to one-half of the gross proceeds plus all the net proceeds. *Id.* at 331, 149 P. at 113.  By 1915, the legislature returned the fraction to one-fourth where it remains today. *Standard Chemical Co. v. Curtis,* 77 Colo. 10, 12, 233 P. 1112, 1114 (1925).

It was clear from the outset that valuation of mines presented "peculiar difficulties" and that the percentage of gross output set by statute could be greater or less than the "real net profit" at a particular mine. *Henderson,* 12 Colo. at 377, 21 P. at 147. This raised no problem for the court which explained,

> this is not intended to be a tax upon the net profit.  It is a tax upon the supposed value of the property itself; the proportion of the gross output selected being simply a basis or guide provided by the legislature in approximating such value.

*Id.*

In 1913 and 1914, this court considered what expense items, if any, could be deducted to calculate "gross proceeds" under the statute.  In its first opinion issued in 1913 and later withdrawn, the court held that no deductions were permitted.  In the subsequent and final opinion, *Paxson v. Cresson Consol. Mining & Milling Co.,* 56 Colo. 206, 139 P. 531 (1914), we held that the "mine-by proceeds" statute required a county assessor to deduct those costs listed in the statute from the gross value of the ore in order to arrive at a sum representing the gross proceeds. *Id.* at 211, 139 P. at 532.  The county assessor had valued the mine in *Cresson* by assessing one-fourth of the gross value of the ore without deducting any of the costs of

reduction, treatment, transportation, or sale of the ore. *Id.*

The statute, however, required each mining company to file an annual statement with the county assessor identifying the mine, the number of tons of ore extracted, and the gross value in dollars and cents of the ore extracted.  The statement also was required to include the "actual cost" of extracting the ore, "transportation to place of reduction or sale," and "treatment, reduction, or sale." *Id.* at 208, 139 P. at 532.  Although the statute did not expressly provide for the deduction of these three cost items, the court construed the statute as requiring such deductions.  It relied especially on two facts: (1) that the mining company was required to report these cost items, and (2) that the county assessor was required to value the mine on the basis of the company's annual statement. *Id.* at 211, 139 P. at 533.

The version of the statute applicable to the case now before us also requires a mining company to submit an annual statement which is substantially similar to the statement required in *Cresson.*  The cost items have been condensed into two paragraphs of the statute but otherwise remain the same.  The mining company is required to report the cost of extracting the ore and the costs of treatment, reduction, transportation, and sale of ore. § 39–6–106(1)(f) & (g), 16B C.R.S. (1982 & 1993 Supp.).  The statute incorporates the principle of *Cresson* to state explicitly that the cost items are deductible.  Paragraphs (h) and (i) provide that (1) the gross proceeds of the ore are determined by deducting all costs of treatment, reduction, transportation, and sale of the ore, and (2) the net proceeds of the ore are determined by deducting all costs of extraction of the ore. § 39–6–106(1)(h) & (i), 16B C.R.S. (1982 & 1993 Supp.).

In light of the constitution, statute, and history of this tax, including particularly the *Cresson* decision, we cannot agree with Climax that a mining company is permitted to deduct cost items which are not listed in the

---

**6.**  The valuation formula in the statute at issue in this case is the same as the formula in the 1902 Act.  *See* § 39–6–105, 16B C.R.S. (1982 & 1993 Supp.) (producing mines whose gross proceeds

exceed $5,000.00) and § 39–6–106, 16B C.R.S. (1982 & 1993 Supp.) (assessor shall value mine at twenty-five percent of gross proceeds or at net proceeds, whichever is greater).

statute. Rather, we conclude that the Property Tax Administrator properly construed the statute in the relevant portions of the manuals and correctly concluded that Climax's margin allocation was not a deductible cost.

## IV.

We conclude that the State Property Tax Administrator's Assessors' Reference Library Manuals are binding on the sixty-three county assessors, and that a margin allocation cannot be deducted as part of the costs of treatment, reduction, transportation, and sale of ore under section 39-6-106, 16B C.R.S. (1982 & 1993 Supp.). Accordingly, we reverse the judgment of the court of appeals.

KOURLIS, J., does not participate.

### *Appendix A*

39-6-106. Valuation for assessment of producing mines. (1) Every person owning or operating any mine classified as a producing mine shall, no later than the fifteenth day of April of each year, prepare, sign under the penalty of perjury in the second degree, and file with the assessor of the county wherein such mine is located a statement showing:

(a) The name of such mine and a list of mining claims and any other lands comprising the mining property of such mine, together with the total number of acres contained in each claim or parcel so listed;

(b) The name of the owner thereof, together with the name of the operator thereof, and the address of each;

(c) The total number of acres contained in such mine;

(d) The number of tons of ore extracted therefrom during the calendar year immediately preceding;

(e) The gross value from production of the ore extracted during said calendar year, which means and includes the amount for which ore or any products derived therefrom were or could be sold by the owner or operator of a mine;

(f) The costs of extracting such ore, excluding the compensation of any officer or agents not actively and continuously engaged in or about the mine;

(g) The costs of treatment, reduction, transportation, and sale of such ore or any products derived therefrom;

(h) The gross proceeds from production of such ore, which means and includes the value of the ore immediately after extraction, which value may be determined by deducting from gross value all costs of treatment, reduction, transportation, and sale of such ore or any products derived therefrom;

(i) The net proceeds from production of such ore, which means and includes the amount determined by deducting from the gross proceeds all costs of extracting such ore.

(2) On the basis of the information contained in such statement, the assessor shall value such mine for assessment at an amount equal to twenty-five percent of the gross proceeds, but if the net proceeds exceed twenty-five percent of the gross proceeds, then such mine shall be valued for assessment at the amount of such net proceeds.

(3) If any mining claim or other land is owned by the same person operating a producing mine which is contiguous to said claim, and if, during the preceding calendar year, ore was actually extracted from said claim or other land or transported through such claim or other land by cut or tunnel, or if any phase of the operation of said producing mines was conducted on such claim or other land, then such claim or other land shall be deemed to be a part of such producing mine and assessed therewith. All other claims or other land under the same ownership shall be valued in the same manner as other real property, on an acreage basis, regardless of surface contiguity.

(4) If any mining claim comprising part of the mining property of a producing mine is not patented or entered for patent, then the possessory interest therein shall be the subject of taxation.

§ 39-6-106, 16B C.R.S. (1982 & 1993 Supp.).