QUESTIONS PRESENTED AND CONCLUSIONS
ISSUE 1: May the Property Tax Administrator publish procedures and instructions to county assessors concerning the valuation of government-assisted housing property, pursuant to her powers and duties outlined in § 39-2-109, C.R.S.?
ANSWER 1: Yes.
ISSUE 2: When using the market approach to appraisal and the procedures and instructions described above, may the Property Tax Administrator consider the effects of government-mandated economic restrictions, such as rent restrictions, that affect specific government-assisted housing property?
ANSWER 2: Yes.
ISSUE 3: When using the market approach to appraisal and the procedures and instructions described above, may the Property Tax Administrator consider the effects of government-mandated property use restrictions, such as land use restriction agreements, affecting specific government-assisted housing properties?
ANSWER 3: Yes.
ISSUE 4: Do property valuation procedures for government-assisted housing that consider the effects of economic and property use restrictions depart from the market approach to appraisal required in Colo. Const. art. X, § 20(8)(c)?
ANSWER 4: No. Such property valuation procedures comply with the Colorado Constitution.
 ANALYSIS
BACKGROUND
The office of Colorado's Property Tax Administrator is created under Colo. Const. art. X, § 15(2). This provision states, in pertinent part:
 The property tax administrator shall have the duty, as provided by law, of
 administering the property tax laws and such other duties as may be prescribed by law. . . .
Pursuant to this constitutional mandate, the Colorado Legislature created the statutory position of the Property Tax Administrator. Among her duties is the oversight of the state property tax valuation system. The pertinent statute provides in part:
 (1) It is the duty of the property tax administrator, and [s]he shall have and exercise authority:
. . . .
 (e) To prepare and publish from time to time manuals . . . concerning methods of appraising and valuing land . . . and to require their utilization by assessors in valuing and assessing taxable property . . . § 39-2-109, C.R.S.
The statutory duties of the Colorado Property Tax Administrator include the education and training of assessors in valuation procedure. The Property Tax Administrator is to "[assist and cooperate] in the administration of all laws concerning the valuing of taxable property, the assessment of same, and the levying of property taxes." § 39-2-109(1)(b), C.R.S. She is to "prepare and publish from time to time manuals, appraisal procedures, and instructions, concerning methods of appraising and valuing land, improvements, personal property, and mobile homes and to require their utilization by assessors in valuing and assessing taxable property." § 39-2-109(1)(e), C.R.S. Finally, "[t]o further improvement in appraisal and valuation procedures and methods and understanding and knowledge thereof, the division of property taxation shall conduct annual instruction and discussion sessions in the nature of a school for assessors, their employees, and employees of the division. . . ." § 39-2-110, C.R.S.
The Colorado Constitution establishes criteria for residential property tax valuation. The general provisions for uniform property taxation and valuation are found in Article X, § 3(1)(a) which provides:
 Valuations for assessment shall be based on appraisals by assessing officers to determine the actual value of property in accordance with provisions of law, which laws shall provide that actual value be determined by appropriate consideration of cost approach, market approach, and income approach to appraisal. However, the actual value of residential real property shall be determined solely by consideration of cost approach and market approach to appraisal. . . . (Emphasis added.)
In 1992, the voters adopted Section 20 to Article X, commonly known as the TABOR amendment. While TABOR dealt mostly with revenue and expenditure limitations for Colorado government, it also further modified criteria for residential property tax valuation. Article X, § 20(8)(c) provides in pertinent part:
 Actual value shall be stated on all property tax bills and valuation notices and, for residential real property, determined solely by the market approach to appraisal.
(Emphasis added.)
DISCUSSION OF ISSUE 1
The first issue to be addressed in this opinion is whether the Property Tax Administrator may publish procedures and instructions to county assessors concerning the valuation of government-assisted housing property. This matter concerns the powers and duties of the Property Tax Administrator outlined in § 39-2-109, C.R.S.
In Huddleston v. Grand County, 913 P.2d 15, 17-18 (Colo. 1996), the Colorado Supreme Court recognized and affirmed the Property Tax Administrator's broad authority to prepare manuals and procedures, as well as to require that the assessors of the sixty-three counties utilize these manuals and procedures to carry out their responsibilities pursuant to Colo. Const. art. X, § 3.
The Grand County case concerns the valuation of a mining property. The Grand County Assessor had refused to allow the owner of the mine to use a particular tax deduction, citing as grounds for his decision the Property Tax Administrators' Reference Library Manuals. The mining company appealed that decision administratively, and then in court. It argued that the Property Tax Administrator's manuals were not binding upon county assessors. The Supreme Court disagreed with the mining company.
Grand County holds that the statutory requirement of §39-2-109(1)(e) "implements the mandate of the Colorado Constitution that all property tax valuations operate equally and uniformly upon all those affected." 913 P.2d at 18. The Court recognized the danger of disparate valuations absent the uniformity of the manuals combined with the Property Tax Administrator's requirement of their use by all county assessors. It declared:
 [The] legislature created an administrative office and assessment process to ensure uniformity among the sixty-three counties. Without the uniform use of the manuals, county assessors would have no standard process to value the mines and the Property Tax Administrator would be unable to determine whether the county assessors had valued the property correctly. Hence, we conclude that the manuals are binding on the sixty-three county assessors. Id.
The Grand County opinion is dispositive concerning this issue. The need for uniform valuation of government-assisted housing across Colorado, through the use of manuals and the instructions they contain, is identical to the need for the uniform valuation of mining properties recognized by the Supreme Court. I therefore conclude that the Property Tax Administrator is empowered to create manuals for the valuation of government-assisted housing, and that she is empowered to require the county assessors' utilization of those manuals pursuant to § 39-2-109(1)(e), C.R.S.
DISCUSSION OF ISSUES 2 AND 3
The second portion of this opinion addresses whether the Property Tax Administrator can adopt procedures that mandate consideration of the effects of economic conditions, such as government-mandated rent restrictions affecting specific government-assisted housing property, and property use restrictions, such as land use restriction agreements, when using the market approach to an appraisal. I conclude that she has the power to mandate these considerations. These principles are affirmed by the Colorado Supreme Court and in property valuation texts and standards that define the market approach to appraisal.
As noted above, TABOR requires that the valuation of residential real property be determined solely by the market approach. Colo. Const. art. X, § 20(8)(c). Government-assisted housing properties are classified by statute as residential property in Colorado. §39-1-102, C.R.S. It therefore is the constitutional duty of the Property Tax Administrator to value government-assisted housing solely by use of the market approach to appraisal.
For this reason, the inquiry in this section turns upon the meaning of the "market approach to appraisal." A Colorado Supreme Court case and authoritative appraisal texts and standards give content to the meaning of this term.
The Colorado Supreme Court has established that below-market rents must be considered by a county assessor when valuing property subject to a long-term lease. The case involved is City and Countyof Denver v. Board of Assessment Appeals of the State of Coloradoand Regis Jesuit Holding, Inc., 848 P.2d 355 (Colo. 1993). It concerns a property operated commercially that was burdened by below-market rent associated with a long-term lease. The Denver tax assessor valued the property without considering the effect of the below-market lease. The owner of the property argued that the effect of the lease on the value of the property must be considered.
Denver argued that "below-market leases distort the actual rent value or invited taxpayers to manipulate artificially depressed property values contrary to the constitutional and statutory mandates that property be assessed at its actual value."848 P.2d at 361. The Supreme Court rejected this argument. It stated:
 The actual value of improved real estate is arrived at by considering all the various circumstances that affect it. [Citation omitted.] It is axiomatic that the `actual value' of real property for tax assessment purposes is grounded in the marketplace where the customary willing seller/willing buyer concepts are applicable; whether such willing seller and willing buyer place an `actual value' on the property by looking at other sales of comparable properties (the `market approach'), by capitalizing the net income from the property (the `income approach'), or by calculating the cost to replace the improvements less depreciation plus vacant land value (the `cost approach'). To ignore the effect of the [long-term, below-market] lease on the judgment of a purchaser in his estimation of the fair market value of the property is to ignore the mandate that the property is to be valued at its actual value. . . . Thus, it follows that both the actual rent and the fair market rent may be used to determine the actual value of the property. Id. at 361-362.
The holding of Regis Jesuit Holding is confirmed by authoritative appraisal texts. They declare that all the conditions of the property must be taken into consideration by the appraiser. For example, one such text states:
 In valuation assignments, particularly in estimations of market value, an appraiser's understanding of the market for a specific property provides the criteria with which to research, select, and interpret the comparability of other properties. To arrive at an estimate of market value, the appraiser must identify and analyze the market or markets that influence the subject property. Appraisal Institute, The Appraisal of Real Estate 55 (11th ed. 1996).
Economic and other pertinent information must be considered:
 [t]he assessor must recognize national, regional, or neighborhood forces that influence the value of property. Assessors must also understand the four great forces — economic, environmental (physical), social, and governmental — by which value is created, maintained, modified, or destroyed. Because values represent anticipated benefits to be received from property ownership, economic trends play an important role in the future of the property.
 The value of property is affected indirectly by many forces external to the property. . . . On the national level in the United States, forces include Federal Reserve policies, treasury policies, interest rates, competition for financing, the Federal Housing Administration and Veterans Administration policies, income taxes, and national tariffs. At the regional level, the forces begin to have a more direct effect on property values. Examples of regional forces include the unemployment rate; income levels; population increases, decreases and shifts; availability of financing; and local imports and exports. The collection and analysis of international, national and regional data and determination of their affects locally is called an economic base analysis. The analysis of economic base data is important . . . in predicting changes in property values, since it is expected that people dealing in the market have considered economic base data in establishing list prices, offers, and sales prices. However, if the market does not appear to recognize the trends found in analyzing data, the assessor must rely on the market as the best evidence of market value. International Association of Assessing Officers, Property Assessment Valuation 51-53 (2nd ed. 1996) (emphasis added).
A property appraiser must take into account any and all conditions that affect the value of property in the market approach to appraisal.
 The sales comparison approach is the process in which a market value estimate is derived by analyzing the market for similar properties and comparing these properties to the subject property. The comparative techniques of analysis applied in the sales comparison approach are fundamental to the valuation process
. . . .
 A major premise of the sales comparison approach is that the market value of a property is directly related to the prices of comparable competitive properties
. . . .
 Comparative analysis focuses on similarities and differences among properties and transactions that affect value. These may include differences in property rights appraised, the motivations of buyers and sellers, financing terms, market conditions at the time of sale (the comparative numbers of buyers, sellers, and lenders), size, location, physical features, and, if the properties produce income, economic characteristics. Elements of comparison are tested against market evidence to estimate which elements are sensitive to change and how they affect value. Appraisal Institute, The Appraisal of Real Estate 397 (11th ed. 1996).
In accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP"), an appraiser must consider unusual conditions associated with a property in a market value appraisal.
 If the opinion of value is to be based on non-market financing or financing with unusual conditions or incentives, the terms of such financing must be clearly identified and the appraiser's opinion of their contributions to or negative influence on value must be developed by analysis of relevant market data. Appraisal Standards Board, Uniform Standards of Professional Appraisal Practice 14 (2000 ed.) (Standards Rule 1-2(c)(iv))
Moreover, USPAP Standards Rule 1-2(e)(iv) requires the appraiser to identify all the characteristics of the property that are relevant, including:
 Any known easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a similar nature; Id.
Finally, Advisory Opinion 14 of the Appraisal Standards Board ("ASB") directly addresses the issue of appraisal of subsidized housing. Appraisal Standards Board, Uniform Standards ofProfessional Appraisal Practice 129 (2000 ed.). Advisory Opinion 14 first confirms the uniqueness of government-assisted housing and the requirement for "knowledge and experience that goes beyond typical residential appraisal competency" in valuing government-assisted housing projects. Id. It then states:
 Appraisers should be aware that the competency required to appraise subsidized housing extends beyond typical residential appraisal competency. Subsidized housing appraisals require the appraiser to understand the various programs, definitions, and pertinent tax considerations involved in the particular assignment applicable to the location and development. An appraiser should be capable of analyzing the impact of the programs and definitions in the local subsidized housing sub market, as well as the general market that is unaffected by subsidized housing programs. Appraisers should also be aware of possible political changes that will affect the durability of the benefits and restrictions to subsidized housing projects and fully understand interpretation and enforcement of subsidy programs. An appraiser's lack of knowledge and understanding of the impact of the various influences that affect subsidized housing projects could lead to misleading conclusions. Id.
Based upon these authorities, I conclude that the Property Tax Administrator may recognize and respond to the need for specialized procedures and educational experience in the valuation of government-assisted housing.
The Property Tax Administrator has published procedures for valuing government-assisted housing, found in the Property Tax Administrator's Manual, PUB ARL 3 1-89, Revised 5-00, from page 7.25 to 7.33. These procedures define government-assisted affordable housing, describe various government-assisted housing programs, and provide sources for information about these programs. The Property Tax Administrator then sets forth steps for determining value. The procedures state:
 Valuation of taxable rent-restricted housing properties that receive below-market rents should reflect an economically derived market adjustment (EDMA) due to the reduced revenue stream. Restricted rents are mandated through property use restrictions recorded by [the Colorado Housing Finance Authority.]
The procedures then describe six steps to reach the EDMA by comparing the rent that would be received without the rent and property use restrictions with the actual rents received by the property.
Because these procedures take into account the specialized characteristics of government-assisted housing in a manner that applies the principles and guidelines of the authoritative appraisal texts, USPAP rules, and Advisory Opinion 14 (AO-14), I therefore conclude that they are lawful under Colorado's statutes and Constitution.
DISCUSSION OF ISSUE 4
The previous portion of this opinion addressed the powers of the Property Tax Administrator to mandate certain considerations. The final portion of this opinion extends this discussion to address whether government-assisted housing appraisal procedures that consider the effects of economic and property use restrictions meet the market approach required by TABOR in Colo. Const. art. X, § 20(8)(c). I conclude that such appraisal procedures are proper under the Colorado Constitution.
Colo. Const. art. X, § 20(8)(c) requires assessors to recognize government sales of property as market comparables. Article X § 20 (8)(c) further, requires that the value for residential property be determined by the market approach. The market approach allows consideration of any and all conditions that affect the property. These conditions include any economic characteristics or use restrictions that affect the property. The economic characteristics and property use restrictions that are associated with government-assisted housing projects are part of the market considerations that effect the property and must be considered and applied as a factor when using the market approach.
The Property Tax Administrator's use of the sales comparison approach in her procedure manual is proper. As discussed above, the sales comparison approach is synonymous with the market approach. The Appraisal Institute states:
 The sales comparison approach is the process in which a market value estimate is derived by analyzing the market for similar properties and comparing these properties to the subject property. The comparative techniques of analysis applied in the sales comparison approach are fundamental to the valuation process. . . . In the sales comparison approach, market value is estimated by comparing properties similar to the subject property that have recently been sold, are listed for sale or are under contract. A major premise of the sales comparison approach is that the market value of a property is directly related to the prices of comparable, competitive properties. The Appraisal Institute, The Appraisal of Real Estate 397 (11th ed. 1996)
The Appraisal Institute further validates the sales comparison approach as part of the market approach by describing how economic characteristics are to be treated and considered by the appraisers. It states in its text:
 Economic characteristics include all the attributes of a property that affect its income. This element of comparison is usually applied to income-producing properties. Characteristics that affect a property's income include operating expenses, quality of management, tenant mix, rent concessions, lease terms, lease expiration dates, renewal options, and lease provisions such as expense recovery clauses. Investigation of these characteristics is critical to proper analysis of the comparable and development of a final value estimate. Id. at 413.
As stated throughout this opinion, when applying the market approach to value the assessor must recognize and adjust for the characteristics of the property, including government-restricted rents.
I conclude that government-assisted housing valuation procedures that consider actual economic characteristics and property use restrictions do not conflict with the Colorado Constitution.
Issued this 13th day of June 2000.
KEN SALAZAR Attorney General
RENNY FAGAN Deputy Attorney General
LARRY WILLIAMS First Assistant Attorney General
Business and Licensing Section
1525 Sherman Street, 5th Floor
Denver, Colorado 80203